**STATE of Tennessee, Appellee,**

v.

**Donald Joseph RUANE, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

July 14, 1995.

---

Jeffrey A. DeVasher, Senior Asst. Public Defender (On appeal) and David M. Siegel, Senior Asst. Public Defender (At trial), Nashville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Charlette Reed Chambers, Assistant Attorney General, Rosemary Sexton and Cheryl Blackburn, Asst. District Attorney Generals, Nashville, for Appellee.

## OPINION

WADE, Judge.

The defendant, Donald Joseph Ruane, was convicted of second degree murder and sentenced to twenty-five (25) years the Department of Correction as a Range I Offender. Tenn.Code Ann. §§ 39–13–210 and 40–35–112.

In this appeal, the defendant presents the following issues for review:

(1) whether the trial court erred by denying the defendant's motion to dismiss the indictment;

(2) whether the trial court erred by excluding testimony of prior statements by the victim;

(3) whether the trial court erred by excluding evidence of a prior violent act by the victim;

(4) whether the trial court erred by failing to instruct the jury on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter; and

(5) whether the trial court erred by imposing the maximum sentence.

Because we find that the trial court committed reversible error, the judgment of the

trial court is reversed and the cause is remanded for a new trial.

At approximately 10:30 P.M. on May 3, 1992, the defendant shot the victim, Donald Willis, at Marcy's, a Nashville bar. The bullet severed the victim's spinal column in the neck area and caused instant paralysis. Although the victim went into full cardiac arrest, firefighters and paramedics were able to revive him and then transport him to Vanderbilt Hospital. Thereafter, the victim was able to breathe only with the assistance of a ventilator. He could communicate by nods or eye movement. The victim's condition was such that he could not live without artificial life-support and he soon expressed a strong desire to discontinue use of the ventilator. The life support was terminated by court order on May 13, 1992. The victim died 10 to 15 minutes later.

Raynaldo Martine, a member of the band which played at Marcy's, testified for the state. He recalled "seeing [the defendant] walking rather briskly, with something at his side." He said the defendant walked up to another man sitting at the bar, put something right up to the back of his head and shot. Martine testified that the victim had his back to the defendant and that no words had been exchanged. Within moments of the shooting, the defendant left. Martine stated that he followed the defendant out to the parking lot and watched him get into a car; he got the defendant's license number and attempted to follow on foot. Martine related that he lost sight of the car briefly but relocated it at Priest Lake Apartments. Martine then returned to Marcy's, waited for the police, and led them to the car. When the police brought the defendant out of the apartments, Martine made a positive identification.

Cynthia Kelley testified that she and the victim had been together since about 7:30 P.M. on the night of the shooting and had arrived at Marcy's at around 10:30 P.M. She stated that after taking a seat at the bar, the victim handed her his truck keys and said, "[T]here may be trouble." The next thing she remembered was hearing the gunshot and seeing the victim fall to the floor. As she turned, she saw the defendant "nonchalantly, just [walk] out of the building."

Officer Phillip Meador testified that two members of the band had seen the assailant leave in an "older model green car"; they had taken down the tag number of the vehicle and followed it to an apartment building. Although there was a slight difference in the license number, officers found the car where the witnesses said it would be. Officer Meador stayed at the apartments and watched the car until other officers arrived.

The defendant lived with his parents. After gaining consent to enter the apartment from the parents, Detective David Miller and three uniformed officers arrested the defendant. They found him undressed and lying in bed with his eyes shut. The defendant, who did not appear to be surprised, did not seem to be intoxicated and consented to searches of his apartment and his car. Although a .25 caliber shell casing had been found at the scene, the officer did not find a .25 caliber weapon at the residence. The defendant did, however, tell Detective Miller that "he was just paying [the victim] back for several scores and that [he] deserved everything he got and more." The defendant admitted he always carried a gun. He claimed that the victim was "forever picking on him."

George R. Devine, Jr., testified that he arrived at Marcy's between 8:30 and 9:00 P.M., sat at the bar, and became acquainted with the victim. Later, Devine saw a man enter Marcy's and stand at the planter box behind the victim for a couple of minutes. As the band started to play, Devine heard a "loud bang," turned, and saw the same man with his hand near the victim's head. The victim then fell to the floor. Devine provided a physical description of the assailant that matched that of the defendant.

Donna Gibbs was a waitress at Betty Lou's Bar and Grill next door to Marcy's. She testified that she had seen the defendant at 6:00 P.M. on the day of the shooting and that he was intoxicated; he left within fifteen minutes of her arrival. She further testified that the defendant returned at about 10:00 P.M. and told another patron, Jack Pelty, that the victim "was next door, and that he was going to go f___ [him] up." The defen-

dant then left. Within minutes, Ms. Gibbs heard a shot, looked outside, and saw the defendant leave with Jack Pelty.

Betty Jean Pursley, who was also at Marcy's on the night of the shooting, testified the defendant had come in the bar and offered to buy everyone a beer; that included the victim. When another man offered to buy the defendant a beer however, the defendant declined and left the bar. About thirty minutes later, the defendant returned and walked straight toward the victim. Although Ms. Pursley never saw a gun, she did hear a loud noise and then saw the defendant walk out of the bar.

Michael Herrod, the defendant's stepbrother, testified that on the day after the shooting, the defendant told him where to find the gun used to shoot the victim. Herrod found the weapon in some brush near the defendant's apartment, placed it in a bag, and turned it over to the police. Don Carman, a firearms expert with the Tennessee Bureau of Investigations Crime Lab, testified that the cartridge case found at Marcy's matched one taken from the gun.

Dr. Noel Tulipan testified that when the victim was admitted to Vanderbilt Hospital, he was in a coma, unresponsive to any stimuli to his legs or arms, and unable to breath without the assistance of a ventilator. Within 24 to 48 hours, however, the victim was "wide awake" and able to communicate through nods, with eye movement, and by mouthing words. The gunshot had caused a "devastating injury to [the] spinal cord" and the victim was told that he could not regain movement in his arms or legs and would not be able to breathe without the continuous assistance of a ventilator.

Upon learning of his condition, the victim told the hospital staff that he wanted to be taken off of the life-support equipment. Once doctors determined that he was mentally competent to make such a decision, the hospital received court approval to turn the ventilator off. Ten to fifteen minutes after he was removed from life support, the victim died.

Dr. Tulipan testified that there were often complications, such as pneumonia, which af-fected patients on ventilators. By the time of his death, the victim had already suffered a mild case of pneumonia. Dr. Tulipan also testified that there was a reasonable probability that the victim would still be alive had he stayed on life support.

Dr. Charles Warren Harlan, Chief Medical Examiner for the State of Tennessee, performed the autopsy. He listed the cause of death as a gunshot wound to the neck which had cut the spinal cord in half. It was his opinion that the gun was within two to six inches of the victim when fired. He confirmed that the victim had a fairly high blood-alcohol level at the time of the shooting.

The defendant, claiming self-defense, testified in his own behalf. He related that he had served in the Navy for two years and had worked in concrete construction until being shot in 1969. The defendant claimed that he had been disabled by a combination of the gunshot wound and a subsequent leg injury; as a result, he worked only on a part-time basis. The defendant explained that he carried a weapon because of the prior shooting incident. He testified that because the victim had assaulted and threatened him on several occasions since Thanksgiving of 1990, he was afraid of the victim and tried to avoid him. He said that on the day of the shooting he had been drinking all day while he worked on cars. He said that he continued to drink at Marcy's and bought a round of drinks after the victim arrived. The defendant explained that he went next door to Betty Lou's for a time and did not return until after he thought the victim might have left. After ordering a beer, however, he saw the victim, feared that he was "coming at him," and shot him. The defendant claimed that he returned to his residence to wait for the police.

Debbie Wilkerson and Vincent Rowe confirmed that the victim had assaulted the defendant in December of 1990. Each stated that the defendant had been knocked across the room and while lying on the floor, had been struck several times with a bar stool. Each testified that the defendant never struck back. Rowe helped pull the victim off

the defendant, who had been beaten badly during the incident.

Jesse James testified for the state in rebuttal. He stated that he saw the defendant enter the bar carrying something at his side, walk over to the victim, raise his gun and shoot the victim.

After receiving instructions on first degree murder, second degree murder, attempted first and second degree murder and aggravated assault, the jury returned a verdict of second degree murder.

## I

The first issue raised by the defendant is whether the trial court erred in denying his pretrial motion to dismiss the indictment. He argues that there was an insufficient causal chain to support any degree of homicide due to the victim's conscious decision to be disconnected from his ventilator. Stated otherwise, the question is whether the victim's decision to refuse medical care was the superseding cause of death.

The defendant filed a pretrial motion to dismiss the indictment for lack of causation. At the hearing that followed, the defendant introduced copies of the complaint, answer, and the order in the victim's civil lawsuit in the Fifth Circuit Court for Davidson County. These documents established that the victim was fully competent and had asked for and received court permission for the removal of all artificial life-support:

> The plaintiff here, because of a traumatic injury, has permanently lost the use of his arms and legs and will never be able to breath without a respirator and/or ventilator. This lawsuit asks this Court to recognize the right of the plaintiff to discontinue the use of the respirator and/or ventilator which will result in his death.

> After considering the evidence, including an interview at the hospital with the plaintiff, his mother and two brothers, the Court is of the opinion that a mentally competent adult who is fully informed of his/her prognosis, the medical alternatives, and the risk of withdrawing medical treatment may decide to refuse treatment if the patient's chart contains typed, signed

statements from two independent physicians that the patient is competent and fully informed of the consequences of refusing treatment. If these criteria are met, court authorization is not required unless there are conflicting opinions between doctors and/or family members of the patient.

This case does not involve an incompetent person but rather one who is said to be competent. Generally speaking, competent individuals may refuse medical treatment. In the recent case of *Cruzan v. Director of Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the Supreme Court recognized that "the logical corollary of the doctrine of informed consent is that the patient generally possesses a right not to consent, that is to refuse treatment" and "the common law doctrine of informed consent is viewed as generally encompassing the right of competent individuals to refuse medical treatment." *Id.* at 270 and 277, 110 S.Ct. at 2847 and 2851.

*John Doe v. Vanderbilt University,* No. 92C–927 (5th Cir.Ct. for Davidson County, May 12, 1992).

Dr. Noel Tulipan, a neurosurgeon at Vanderbilt Hospital began his treatment of the victim soon after his arrival at the hospital. Dr. Tulipan stated that the victim was initially in a coma, but within 24 to 48 hours of the shooting had regained consciousness and become completely aware of his situation. He testified that the victim's "spinal cord was ... completely divided in half" and that he would not recover any spinal function at all; thus, the victim had permanently lost all use of his body below the neck and would continue to be unable to breath or speak on his own. Dr. Tulipan described the victim's brain and mental capacity as uninjured but noted that the victim was alive only because of quick medical treatment and the use of artificial life-support. He attributed his death to "his spinal cord injury" and yet acknowledged that the victim's condition was stable and that he would not have died when he did absent the termination of life support.

The trial court overruled the motion and held that the state could seek to prove the

elements of homicide. This court denied an application for extraordinary appeal on two grounds:

1. "Causation" is a question of fact to be determined by a jury. For this court to establish causation preliminarily would be, in our opinion, inappropriate.

2. The defendant has failed to demonstrate that he will suffer a "severe injury" unless review is granted.

*State v. Donald Joseph Ruane*, No. 01C01-9212–CR–00389 (Tenn.Crim.App., at Nashville, Jan. 19, 1993) (Order on Application).

At the conclusion of the trial, the trial court charged the jury on first degree murder, second degree murder, causation, and inferences. The court then provided instruction for attempted first and second degree murder and aggravated assault. After deliberation, the jury returned a verdict of second degree murder, defined as the "knowing killing of another." Tenn.Code Ann. § 39–13–210.

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn.Code Ann. § 39–11–302(b). A second degree murder conviction can also be sustained if the acts are intentional. Tenn.Code Ann. § 39–11–301(a)(2).

"Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

Tenn.Code Ann. § 39–11–302(a).

In this appeal, the defendant maintained that, "as a matter of law," the victim's conscious decision for the removal of artificial life-support broke the causal chain. He claims that the matter of causation should not have been submitted to the jury.

■ The defendant has made reference to the "year and a day" rule in his challenge on the issue of causation. At common law, the proof must have established that the victim died within a year and a day from the date of the injury received. *Percer v. State*, 118 Tenn. 765, 103 S.W. 780 (1907); *Cole v. State*, 512 S.W.2d 598 (Tenn.Crim.App.1974). The defendant argues that the victim was medically stable and would have continued living for an indefinite period had life-support been continued. The defendant argues that the operating cause of death was the removal of life-support rather than the gunshot wound. "The basis for the rule was the difficulty in determining after a long period of time whether it was the defendant's blow or natural forces that actually caused the death." Robinson, *Criminal Law Defenses*, § 105(h) (1984). Many jurisdictions have either abandoned or modified the rule based upon the advances in medical science which now more effectively deal with the "cause-of-death" problems. *Id.;* C. Torcia, *Wharton's Criminal Law*, § 118 (15th ed. 1994). The Criminal Sentencing Reform Act of 1989 abolished defenses available at common law. Tenn. Code Ann. § 39–11–203(e)(2).

Affirmative defenses are listed by statute. Tenn.Code Ann. § 39–11–204. The "year-and-a-day rule" is not listed among those defenses now available. Furthermore, the defense could not apply here anyway. The death of the victim occurred within ten days of the gunshot wound. Technically, the old rule could not have been applied. In any event, the real question is whether the court or the jury should have determined the question of causation.

■ In order to sustain a criminal conviction for homicide, the evidence must establish that the defendant's actions or conduct caused the requisite harm. Generally, this is established by showing that the victim's death was the natural and probable result of the defendant's unlawful act. *State v. Barnes*, 703 S.W.2d 611 (Tenn.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 705 (1986); *State v. Randolph*, 676 S.W.2d 943 (Tenn.1984); *Letner v. State*, 156 Tenn. 68, 299 S.W. 1049 (1927); *Copeland v. State*, 154 Tenn. 7, 285 S.W. 565 (1926); *Odeneal v. State*, 128 Tenn. 60, 157 S.W. 419 (1913). In *Odeneal*, our supreme court es-

tablished the general rule on the issue of causation:

> One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.

128 Tenn. at 69, 157 S.W. at 421; *see also State v. Barnes*, 703 S.W.2d at 615 (quoting *Odeneal*). This causal chain may, however, be broken. In *Letner*, our supreme court discussed the relevance of intervening or superseding acts:

> "Where it appears that the act of the accused was not the proximate cause of the death of the person for whose murder he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a good defense to the charge of homicide." [13 R.C.L. 750.]

> \* \* \* \* \* \*

> [But] "[w]henever an independent responsible person, disconnected with the defendant, causes some intervening act to be done, the defendant is relieved of responsibility for the consequences thereof, *unless the act of intervention is the natural result of the defendant's act.*"

> \* \* \* \* \* \*

> "The unlawful act of omission need not be the sole cause of death. Thus if defendant's negligence was a cause of the death, it is immaterial that the negligence of the deceased himself or of others also contributed thereto. If an injury caused by defendant contributed to the death, defendant is responsible, although a subsequent mortal wound inflicted independently by another also contributed thereto. Defendant's act or omission need not be the immediate cause of death; he is responsible if the direct cause results naturally from his conduct. The same is true if the direct cause is *an act of the deceased himself* reasonably due to the defendant's unlawful conduct."

> \* \* \* \* \* \*

> In other words, the defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause when such cause naturally resulted from his wrongful act.

156 Tenn. at 75–76, 299 S.W. at 1050–51 (emphasis added) (quoting *Corpus Juris*).

■ Therefore, to establish that the victim's decision to have life-support equipment removed insulated the defendant from criminal responsibility for the victim's death as a matter of law, the victim's decision must be so "unexpected, unforeseeable or remote" that the defendant's actions could not legally be the cause of the death. *See State v. Randolph*, 676 S.W.2d at 948. Generally, our courts have held this to be a factual issue to be determined by the trier of fact based upon the evidence introduced at trial. *Id.* Here, that would clearly support the position of the state.

■ The court-approved removal of life-support after a criminal assault has not been specifically addressed in this state.[1] Other jurisdictions, however, have found a homicide conviction proper under similar facts. In *United States v. Hamilton*, 182 F.Supp. 548 (D.D.C.1960), for example, a victim was hospitalized for a nonfatal wound. Tubes were inserted in his nose. Three days later, the victim pulled the tubes out of his nose and died from asphyxiation. The court held that the defendant legally caused the victim's death whether the pulling of the tubes was a reflex action, a semiconscious act, or a conscious and deliberate act on the part of the victim. *Id.* at 551.

In *People v. Velez*, 159 Misc.2d 38, 39, 602 N.Y.S.2d 758, 759 (N.Y.Sup.Ct.1993), the vic-

---

1. In *civil* actions for wrongful death in Tennessee, our courts have held as follows:

> [W]here a defendant injures another either willfully or negligently and as a result of the injury, the injured person commits suicide the act of suicide is, as a matter of law, an intervening independent cause if the decedent knew and understood the nature of his or her act or the act resulted from a moderately intelligent power of choice.

> *Weathers v. Pilkinton*, 754 S.W.2d 75, 78 (Tenn. Ct.App.1988); *see Lancaster v. Montesi*, 216 Tenn. 50, 390 S.W.2d 217 (1965).

tim suffered a gunshot wound to his neck "with transection of the right internal carotid artery and facial nerve paralysis." The victim was able to communicate by writing or by nodding in response to questions. Later, the victim was transferred to another facility for further rehabilitation. He became depressed at his slow progress. Some two months after being shot, the victim pulled out his feeding tubes and refused to allow medical personnel to intervene. The victim would not eat and refused further medical care. Within a week, he died as the result of a cardiorespiratory arrest. The defendant argued that the victim had recovered from the gunshot wound and had actually committed suicide by refusing nourishment and medical treatment. The court ruled, however, that while the victim acted voluntarily in refusing nourishment and medical treatment, the defendant had committed a homicide:

> [T]he gunshot wound set in motion a chain of events resulting in hospitalization, difficult swallowing, and forced feeding, the cessation of which resulted in death. The gunshot wound forged a causative link between the initial injury and death and was a sufficiently direct and contributing event which eventually resulted in death. The suicide does not operate as an intervening act that excuses criminal liability because death was not solely attributable to this secondary agency. Death was caused by both the gunshot wound and the malnutrition.

159 Misc.2d at 38, 602 N.Y.S.2d at 762.

 From all of this, we are satisfied that the evidence was sufficient to support the second degree murder conviction. The victim's conscious decision to remove artificial life-support, while an act of intervention, was "the natural result" of the defendant's wrongful act. Our holding would appear to be consistent with legislative policy. *See* Tenn.Code Ann. §§ 32–11–101 through –112. The Tennessee Right to Natural Death Act provides as follows:

> The general assembly declares it to be the law of the state of Tennessee that every person has the fundamental and inherent right to die naturally with as much dignity as circumstances permit and to accept, re-

fuse, withdraw from, or otherwise control decisions relating to the rendering of the person's own medical care, specifically including palliative care and the use of extraordinary procedures and treatment. . . .

Tenn.Code Ann. § 32–11–102(a). In subsection (b) of § 32–11–102, the general assembly expressly approved of written "living wills" as a means of exercising this right after a loss of competency. If death occurs pursuant to a living will it shall not be classified as suicide:

> The withholding or withdrawal of medical care from a declarant in accordance with the provisions of this chapter shall not, for any purpose constitute a suicide, euthanasia or homicide.

Tenn.Code Ann. § 32–11–110(a).

In our view, the trial court properly denied the motion to dismiss the indictment. The causal chain established by the evidence supports the homicide conviction.

 In considering this issue, we have also reviewed the trial court's instructions to the jury on cause of death. Although these instructions have not been challenged, we note that certain portions of the charge which use the term "contributing" may tend to either mislead or confuse the jury. Because we have ordered a retrial on other grounds, we suggest that the trial court modify the jury instruction to delete any language which suggests that the defendant need only "contribute" to the death of the victim in order to establish criminal responsibility. We would also suggest that the trial court omit the following language:

> When a wound from which death might ensue is inflicted with intent to kill, you may infer that death following that wound was caused by such wound. If you so infer, the defendant should show that death resulted from some other cause not attributable to the defendant. However, the burden of proof never shifts and is always upon the State to prove beyond a reasonable doubt that the death of the deceased was brought about by the unlawful act of the defendant.

While the trial court cautions that the burden does not shift from the State, we believe

this language as a whole would also tend to mislead or confuse the jury concerning the burden of proof on the issue of causation.

In summary, we would have found this evidence sufficient to support a second degree murder conviction.

## II

The second issue raised by the defendant is whether the trial court erred by excluding testimony by Martha Jean Cantrell as to prior statements made by the victim. The following excerpts have been taken from the offer of proof:

Q. Ms. Cantrell, I want to draw your attention back to the occasion where you testified earlier that you saw [the victim] up at Betty Lou's; okay?

A. Yes, sir.

Q. Okay. Who else was there with you, Ms. Cantrell?

A. Me and Jack [Pelty].

* * * * * *

THE COURT: When was this that you're talking about?

THE WITNESS: It was right after I started going with Jack, which was about March the 19th, so it was probably the middle of April [1991].

* * * * * *

Q. And what did [the victim] say to Mr. Pelty?

A. Well, he was just using a lot of abusive languages. And as I turned around, Jack told me to go into Marcy's, because he didn't want me to be there. When I turned around and started walking off, I heard him tell Jack that, *"I should have killed that little son of a bitch."*

* * * * * *

Q. Now, you stated you saw [the victim] on two occasions. When was the next time you saw him?

A. Not too long after that down at the boat dock, at Four Corners Boat Dock.

Q. Was that in the year, 1991?

A. Yes, sir. I'd say a few weeks after that.

* * * * * *

A. Probably about May, around in May. It wasn't too long after that.

* * * * * *

Q. Who else was there at that time, Ms. Cantrell?

A. I was sitting on the—he came walking down the ramp and I was sitting there fishing. And Betty Lou came across the ramp going to her boat and carrying groceries. And he hollered and said ... "Can I come back to your bar?" She says, "You know you're still barred from my bar." And she says ... something, like, "Since you're already barred from my bar, you know why you are." He said, *"Well, I should have killed that little son of a bitch then."* And he called her bad names and turned around and just started walking down the boat dock. That was the only two times I ever saw the guy.

Q. And at that time, he was talking about [the defendant]?

A. Yes, sir. I would assume—I mean, you know, there were no names called, but I would—you know.

(Emphasis added to specific statements).

On cross-examination, the following exchange took place:

Q. He said, "I should have," referring to something that happened in the past; isn't that correct?

A. Yes, sir. Yes, ma'am, rather.

Q. He wasn't saying he was going to go do something. He was talking about it; isn't that right?

A. Yes, sir. Yes, ma'am.

Q. He didn't identify who he was talking about; did he?

A. No, ma'am.

Q. You were making assumptions about it. He could have been talking about anybody, to your knowledge; isn't that correct?

A. Yes, ma'am.

* * * * * *

THE COURT: You're saying that he didn't really identify anyone on either of these occasions. You're saying he just said, "little son of a bitch."

THE WITNESS: Yeah....

The defense then sought to clarify some of the proffered testimony:

Q. Now, you also testified ... that you knew of the previous incident between [the defendant] and [the victim]. You knew of that previous incident?

A. Are you talking about the fight?

Q. Yes, ma'am.

A. I knew of it, yes.

Q. And did you know—

THE COURT: Were you present when that happened?

THE WITNESS: No, sir.

Q. Did you know also as a result of that, [the victim] was barred from Betty Lou's?

A. From what—from what they said, yes.

Q. And on that particular day that you saw [the victim] over at the lake, ... [the defendant] was not there; was he?

 \* \* \* \* \* \*

A. No. There was nobody sitting there, but me.

Q. Was he later informed of what was said at the lake?

A. No. I haven't seen [the defendant] since then.

Q. You haven't seen him since then. But in your mind, at that time, the statement that [the victim] made, do you think that it was directed ... to [the defendant]?

A. That's what I thought, yes.

After hearing argument from counsel, the trial court ruled that the statements were too remote and that the witness could only infer that the victim had referred to the defendant.

On appeal, the defendant argues that the testimony was admissible under Tennessee Rule of Evidence 803(3) and *State v. Butler*, 626 S.W.2d 6 (Tenn.1981). The state counters that the evidence was irrelevant and otherwise inadmissible under the *Butler* guidelines.

In *State v. Butler*, the trial court excluded certain statements by the victim which tended to show her animosity toward the defendant despite an issue of self-defense. Our supreme court held as follows:

The character of the deceased for violence, as well as her animosity toward the defendant, as indicated by words and actions at the time of the killing and before, are proper matters for the consideration of the jury upon the question of self-defense. In some cases where self-defense is an issue, uncommunicated threats made by a deceased against a defendant are admissible as going to the state of mind of the deceased. However, the applicability of this rule is limited, and it becomes operative only where relevant to explain the conduct of the deceased in establishing who was the aggressor.

*Butler*, 626 S.W.2d at 11.

Tennessee Rule of Evidence 803, adopted after the decision in *Butler*, sets forth the exceptions to hearsay evidence. Subsection (3) of Rule 803 provides what is often referred to as the "state of mind" exception:

Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The Advisory Commission Comments to Rule 803(3) also provide that "[c]ombining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state."

███ Although the witness merely concluded that the statements made by the victim were about the defendant, that conclusion appears to have been based upon a reasonable inference. Certainly, the victim's state of mind was relevant to the defendant's claim of self-defense. Because the two conversations at issue took place within a year of the crime, the evidence was not so remote as

to preclude admission. That the statements were made several months prior to the shooting went to the weight of the evidence rather than its admissibility. And, whether the statements qualified as threats against the defendant should have been left to the factfinder. Nonetheless, we find the error to have been harmless. The evidence of guilt was overwhelming. The self-defense claim was weak. The claimed threats were equivocal and somewhat remote. In any event, the jury knew the victim had brutally beaten the defendant some two years before this shooting. In the context of the record, it is unlikely that the error affected the judgment.

## III

As his third issue, the defendant claims that the trial court erred by excluding evidence that the victim had assaulted James Hoover on December 25, 1986. On that date, the victim was at Cynthia Kelley's mother's home when Hoover arrived. Later, while everyone was dancing and drinking, Hoover twice asked the victim to stop "fondling" Ms. Kelley. Hoover claimed that "once I got turned around where ... I was looking off, where he could strike me, well, he hit me with a blow in the mouth and knocked four teeth out."

The defendant testified first for the defense. He was followed by several other witnesses. The Hoover testimony was then offered as proof out of the presence of the jury. The trial court stated that while specific instances of prior violent conduct might be admissible under certain circumstances, here the evidence was not admissible because it was too remote in nature to the instant case and its prejudicial effect outweighed its probative value.

Citing *State v. Furlough,* 797 S.W.2d 631, 649 (Tenn.Crim.App.1990), the defendant claims in this appeal that this evidence should have been admitted under the circumstances of this case to corroborate the defendant's contention that the victim was the first aggressor. He asserts that the testimony would have served as proof of provocation

and potentially reduced the grade of the offense to voluntary manslaughter. *See* Tenn.Code Ann. § 39–13–211.

There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim. If the defendant was unaware of the prior acts of violence by the victim, the evidence is admissible for corroborative purposes only. If he is aware of the prior violent acts, he may so testify. *State v. Hill,* 885 S.W.2d 357, 361 (Tenn.Crim.App.1994), *perm. to app. denied,* (Tenn.1994).

In *Furlough,* the defendant, charged with first degree murder, attempted to offer evidence of prior violent acts by the victim to show that the victim was the aggressor. The trial court ruled that the prior acts were not admissible because the victim, who had been killed, could offer no rebuttal. While observing that the error was harmless in the context of the trial and reversing on other grounds, this court ruled that prior acts of violence by the victim against third parties were admissible as proof that the victim was the initial aggressor:

> [S]pecific violent acts of the victim are admissible to corroborate the defendant's assertion that the victim was the aggressor. These acts are *not* admissible to prove the victim acted in accordance with a character trait.

*Furlough,* 797 S.W.2d at 649 (emphasis in original) (citations omitted).

Our opinion in *Furlough,* based in part on the decision of our supreme court in *Little v. State,* 65 Tenn. 491 (1873),[2] preceded the adoption of the Tennessee Rules of Evidence. Following the adoption of the new rules, one authority specifically commented upon their probable effect on this type of evidence:

> Although a recent Tennessee decision, *State v. Furlough,* suggested that the victim's past specific violent acts can also be used to corroborate testimony that the victim was the first aggressor, it is doubtful

2. *See State v. Butler,* 626 S.W.2d 6 (Tenn.1981). There, the supreme court pointed out that the rule was limited and became operative only

when relevant to establish which of the combatants was the aggressor.

if, under Rule 405(a), the Tennessee Rules of Evidence would permit this other than on cross-examination. Despite State v. Furlough's statement that such evidence is not used to prove that the victim acted in accordance with a character trait, the use of specific acts to prove first aggression is character proof of the victim's propensity for violence. This type of evidence is not authorized on direct testimony under the Tennessee Rules of Evidence.

N. Cohen, D. Paine & S. Sheppeard, *Tennessee Law of Evidence*, § 404.4 (2d ed. Supp. 1994).

▮▮▮ Several opinions by this court have, however, continued to adhere to the *Furlough* rule in spite of the new evidentiary guidelines. The only prerequisite to the admission of the evidence has been that the issue of first aggressor must be raised by evidence. *Hill*, 885 S.W.2d at 361; *see also State v. Curtis Anthony Miller*, No. 01C01–9309–CR–00329, 1994 WL 236014 (Tenn. Crim.App., at Nashville, June 2, 1994), *perm. to appeal denied*, (Tenn.1994). "Self-defense must be at issue by the evidence in the record, not by the words and statements of counsel." *State v. Laterral Jolly*, No. 02C01–9207–CR–00169, 1993 WL 523590 (Tenn.Crim.App., at Jackson, Dec. 15, 1993), *perm. to appeal denied*, (Tenn.1994). Thus a new body of law has developed since the adoption of our new rules. And, while unusual, there are instances when evidence is limited to corroborative purposes only. *See State v. Lewis*, 803 S.W.2d 260 (Tenn.Crim. App.1990); *State v. Jerrell C. Livingston*, No. 01C01–9012–CR–00337, 1991 WL 181058 (Tenn.Crim.App., at Nashville, September 17, 1991), *perm to app. granted*, (Tenn.1993). By the use of the *Hill* standard, it would appear that the trial court should have admitted the evidence for corroborative purposes, that is, for the limited purpose of supporting the defendant's claim of self-defense.

▮▮▮ The Tennessee Rules of Evidence, effective January 1, 1990, govern the admissibility of character evidence. This type of evidence is substantive in nature rather than corroborative. *See Hill*, 885 S.W.2d at 361–63; *State v. Ray*, 880 S.W.2d 700, 705 (Tenn.Crim.App.1993), *perm. to app. denied*, (Tenn.1993); *see also* Tenn.R.Evid. 101. Rule 404 provides that character evidence or a trait of character is generally inadmissible to prove conduct "in conformity with the character or trait"; there are exceptions:

(a)(1) Character of the Accused.—Evidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same.

(2) Character of Victim.—Evidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

\* \* \* \* \* \*

(b) Other Crimes, Wrongs, or Acts.— Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue [3] exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn.R.Evid. 404.

Tennessee Rule of Evidence 405, establishes the methods by which one may prove character evidence admissible under Rule 404. The evidence permitted is not limited

---

3. Motive, intent, knowledge, absence of mistake, common scheme or plan, identity, completion of the story, opportunity, and preparation are among the traditional issues which qualify. N. Cohen, D. Paine & S. Sheppeard, *Tennessee Law of Evidence*, § 404.6 (2d ed. 1994).

to corroboration. Rule 405 provides as follows:

(a) Reputation or Opinion.—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to *reputation* or by testimony in the form of an *opinion.* After application to the court, *inquiry on cross-examination is allowable into relevant specific instances of conduct.* The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

(b) Specific Instances of Conduct.—In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct. . . .

(Emphasis added).

In *State v. Lateral Jolly,* tried after the adoption of the new rules, a panel of this court held as follows:

[B]efore a defendant can offer proof of evidence of first aggression tendencies of the victim ... there must first be raised some issue to which these tendencies would be relevant. Self defense must be at issue by the evidence in the record, not by the words and statements of counsel. The trial judge must then determine if there is a factual basis underlying the allegations of tendencies of first aggression. Then the trial judge must determine whether or not the probative value of the evidence is ... outweighed by the danger of confusion of the issues, or misleading the jury. . . .

*Jolly,* at 9–10, 1993 WL 523590, at *4. Under Rule 404(a)(2), such evidence must be of a *"pertinent* character trait of the victim."

*See also* Tenn.R.Evid. 401, 402, 404(b), and 405(a)(3). To be admissible, the probative value of the evidence must outweigh any prejudicial effect. *Ray,* 880 S.W.2d at 705.

In *Hill,* Judge Joe B. Jones wrote for the court in distinguishing between the *Furlough* corroborative evidence and that offered under Rules 404 and 405. The court ruled that character evidence was admitted through "reputation opinion and specific instances of conduct." *Hill,* 885 S.W.2d at 362. Quoting *Ray,* and reconciling its differences with *Furlough,* this court acknowledged that Rule 405(a) "limited proof of specific instances of misconduct to cross-examination." *Id.* at 363.

From this, and upon concluding that any violent nature on the part of the victim was not essential to the defense, we have determined that the new rules would limit use of the proffered evidence here to cross-examination of the victim. And, of course, that would have been impossible in this instance due to the death of the victim. Thus, the evidence was properly excluded if offered for anything more than mere corroboration. *See State v. Curtis Anthony Miller,* No. 01C01–9309–CR–00329, 1994 WL 236014 (Tenn. Crim.App., at Nashville, June 2, 1994).

This defendant, unaware at the time of the shooting to a specific instance of prior violent conduct by the victim, nonetheless sought to introduce the incident through the testimony of a third person. Under *Hill,* this evidence could have been used to circumstantially corroborate the defendant's claim that the victim was the first aggressor. The prior conduct was not an essential element of a defense, however, and thus, by the rationale in *Ray,* was not admissible as substantive proof by the terms of Rule 405(b).

■ Although we have found that the evidence may have been admitted for the limited purpose of corroboration, this does not end our inquiry. The trial judge excluded the evidence based upon its remoteness and its determination that the prejudicial effect outweighed its probative value. Here the prior conduct occurred in December 1986; the instant offense occurred in May 1992, some five and one-half years later.

The trial court allowed evidence of a December 1990 altercation between the defendant and the victim. When viewed as a single incident, we might agree with the trial court's exclusion of the evidence. Here, however, the evidence established that the victim was the aggressor in both the 1986 and the 1990 incidents and caused injuries to the defendant and a third person. Such evidence was certainly probative on the issue of first aggressor. And, while prejudicial to the state's theory, such evidence, in our opinion, would not have been unduly prejudicial. Under these circumstances, we would not have excluded the evidence based upon remoteness or prejudicial effect. *Compare* Tenn. R.Evid. 609(b) (evidence of prior conviction allowed if not more than 10 years old).

■ In view of all of the other evidence of the victim's prior acts of violence, however, specifically those violent acts against the defendant, we doubt that the exclusion of the testimony, for the limited purpose of corroboration, had any effect upon the results of this trial. Thus, we would have found the error harmless.

## IV

In his fourth issue, the defendant claims that the trial court erred by failing to instruct the jury on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter. The defendant argues that there was sufficient evidence that he acted with passion produced by adequate provocation to warrant the additional instructions. The state argues that the evidence simply did not support such an instruction.

■ The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). It is settled law that when "there are any facts that are susceptible of inferring guilt on any lesser included offense or offenses, then there is a mandatory duty upon the trial judge to charge on such offense or offenses. Failure to do so denies a defendant his constitutional right of trial by jury." *State v. Wright,* 618 S.W.2d 310, 315 (Tenn.

Crim.App.1981) (citations omitted); Tenn. Code Ann. § 40–18–110. When there is a trial on a single charge of a felony, there is also a trial on all lesser included offenses, "as the facts may be." *Strader v. State,* 210 Tenn. 669, 675, 362 S.W.2d 224, 227 (1962). Trial courts, however, are not required to charge the jury on a lesser included offense when the record is devoid of evidence to support an inference of guilt of the lesser offense. *State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994); *State v. Boyd,* 797 S.W.2d 589, 593 (Tenn.1990), *cert. denied* 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991); *State v. Dulsworth,* 781 S.W.2d 277, 287 (Tenn. Crim.App.1989).

In *Wright v. State,* 549 S.W.2d 682 (Tenn. 1977), our supreme court confirmed the test to determine whether an offense is lesser and included in the greater offense. Quoting the late Justice Weldon White in *Johnson v. State,* 217 Tenn. 234, 243, 397 S.W.2d 170, 174 (1965), the *Wright* court ruled as follows:

> The true test of which is a lesser and which is a greater crime is whether the elements of the former are completely contained within the latter, so that to prove the greater the State must first prove the elements of the lesser.

549 S.W.2d at 685–86.

Two years later, the supreme court again addressed the subject:

> We believe that the better rule, and the one to be followed henceforth in this State, is the rule adopted implicitly by this court in *Wright v. State, supra,* that, in this context, an offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser. If there is evidence to support a conviction for such a lesser offense, it must be charged by the trial judge. T.C.A. § 40–2519 [now T.C.A. § 40–18–118(a) ]; *Whitwell v. State,* 520 S.W.2d 338 (Tenn.1975).

*Howard v. State,* 578 S.W.2d 83, 85 (Tenn. 1979) (footnote omitted).

■ Tenn.Code Ann. § 40–18–110(a) requires trial judges to charge the jury on

lesser included offenses charged in the indictment whether requested to do so or not. *See Howard,* 578 S.W.2d at 85. Failure to instruct on a lesser included offense denies a defendant his constitutional right to trial by jury. *State v. Wright,* 618 S.W.2d 310, 315 (Tenn.Crim.App.1981).

Here, the defendant was charged with first degree murder. The lesser included offenses of second degree murder, aggravated assault, and attempted first and second degree murder were properly included in the jury charge. Voluntary manslaughter is also a lesser included offense of first degree murder. *See Howard v. State,* 506 S.W.2d 951 (Tenn.Crim.App.1973). It is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn.Code Ann. § 39–13–211(a). Similarly, attempted voluntary manslaughter would qualify as a lesser included offense of attempt to commit either first or second degree murder.

The defendant argues that there was evidence that he acted with passion produced by adequate provocation to warrant instructions on both voluntary manslaughter and attempted voluntary manslaughter. We agree. The defendant testified that he feared the victim who was larger than the defendant. Several witnesses testified that the victim had previously assaulted the defendant; the defendant had not fought back. Although the far greater weight of the evidence indicated otherwise, the defendant testified that he fired the fatal shot only after the victim moved toward him in a threatening manner. That the victim had a history of barroom assaults provided at least some support to the defense theory that the victim had provoked the defendant.

Although the trial court charged the jury on the issue of self-defense, it did not provide instruction on the offense of voluntary manslaughter. While arguing that no evidence of voluntary manslaughter was introduced, the state unwittingly concedes error by acknowledging that "[t]here is only the defendant's uncorroborated testimony that the victim lunged at him." This evi-

dence, even if uncorroborated, raises a factual issue which can only be resolved by the jury. There was, however, some supporting evidence through the prior assaults of the defendant by the victim. Our guiding principle is that if there is evidence in the record from which the jury could have concluded that the lesser included offense was committed, there must be an instruction for the lesser offense. *See Johnson v. State,* 531 S.W.2d 558, 559 (Tenn.1975). Whether there was adequate provocation to warrant consideration of voluntary manslaughter should have been submitted to the jury.

Recently, Judge Welles spoke for this court in its determination that an omission of a lesser included offense from the charge to the jury always requires a new trial. *State v. Dhikr Abban Boyce,* No. 01C01–9402–CR–00053, 1995 WL 45805 (Tenn.Crim.App., at Nashville, Feb. 2, 1995). The opinion included a quote from *Poole v. State,* 61 Tenn. 288, 294 (1872):

> However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

Although the evidence of provocation was slight, we are required to hold voluntary manslaughter should have been charged to this jury as a lesser included offense. The issue of causation would have also required a jury instruction on the issue of attempted voluntary manslaughter. The trial court's failure to instruct on these lesser included offenses mandates a reversal of the conviction and the grant of a new trial.

V

In his final issue, the defendant challenges the trial court's imposition of a twenty-five (25) year sentence, the maximum for second degree murder. Although the defendant is entitled to a new trial, we will nonetheless address the question of whether the sentence was excessive.

When a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a "de novo review ... with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn.Code Ann. § 40–35–401(d). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, –103, and –210.

The presumptive sentence is the minimum in the range if there are no enhancement and mitigating factors. Tenn. Code Ann. § 40–35–210. Should the trial court find mitigating and enhancement factors, it must start at the minimum sentence in the range and enhance the sentence based upon any applicable enhancement factors, then reduce the sentence based upon any appropriate mitigating factors. Tenn.Code Ann. § 40–35–210(e). The weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the Sentencing Act. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). The trial court, however, should make specific findings on the record which indicate his application of the sentencing principles. Tenn.Code Ann. §§ 40–35–209 and –210.

At the sentencing hearing, the trial court found the following enhancement factors applicable:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn.Code Ann. § 40–35–114(1).

(2) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. Tenn.Code Ann. § 40–35–114(8).

(3) The defendant possessed or employed a firearm during the commission of the offense. Tenn.Code Ann. § 40–35–114(9).

(4) The defendant had no hesitation about committing a crime when the risk to human life was high. Tenn.Code Ann. § 40–35–114(10).

The trial court stated that he relied on the first three factors as the "main" enhancement factors. He described the fourth factor applied concerning the risk to human life as a "sub-enhancement factor" based upon the fact that the defendant shot the victim in a crowded tavern which endangered a number of people.

The defendant does not challenge the application of the first three enhancement factors. The defendant had a history of previous criminal behavior which included convictions for DUI, driving on a revoked license, and possession of a weapon. His two convictions for driving on a revoked license demonstrate his unwillingness to comply with conditions of release. The evidence also clearly established that the defendant used a firearm to commit the offense.

The defendant argues, however, the "no hesitation factor" is inherent in every murder case and should not have applied here. In our view, the facts support application. Several others were present when the defendant shot the victim. The risk of harm to those other individuals warrants the application of this factor.

The defendant also contends that the trial court erred by refusing to apply three mitigating factors:

(1) Substantial grounds existed tending to excuse or justify the defendant's conduct, although failing to establish a defense. Tenn.Code Ann. § 40–35–113(3).

(2) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law

motivated his conduct. Tenn.Code Ann. § 40–35–114(8).

(3) The defendant's remorse for the victim's death. Tenn.Code Ann. § 40–35–113(13).

At the time of sentencing, the defendant was 48 years old and recently married. A navy veteran, the defendant had been employed as a concrete finisher but was unable to work on a full-time basis; he apparently had an alcohol problem and numerous physical problems. The defendant's wife testified that the defendant had stopped drinking since their marriage and that he was very remorseful for what had happened.

At the sentencing hearing, the trial court expressly stated that he found no mitigating factors. The trial court acknowledged the prior history between the parties, the defendant's apparent efforts toward rehabilitation since the offense, and the defendant's lack of any prior felony offenses. The trial court gave great weight to the enhancement factors. Even if some evidence of mitigation exists, the applicable enhancement factors so strongly outweigh the mitigating factors that the maximum sentence is warranted.

Because, however, the trial court erred by failing to instruct the jury on all the possible lessor included offenses, the judgment of the trial court must be reversed and the cause remanded for a new trial.

SUMMERS and WELLES, JJ., concur.