IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. CHRISTOPHER DAVID HODGE

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7359      Joseph H. Walker, III, Judge**

---

**No. W2003-01513-CCA-R3-CD  - Filed October 11, 2004**

---

The defendant, Christopher David Hodge, appeals his conviction of second degree murder.  The defendant alleges that the evidence was insufficient to support the conviction and that the trial court erred in disallowing discovery of certain information relevant to preparation of a defense.  From our review, we conclude there is no reversible error and affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Didi Christie, Brownsville, Tennessee (on appeal); Gary F. Antrican, District Public Defender, and Julie D. Pillow, Assistant Public Defender (at trial), for the appellant, Christopher David Hodge.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case involves a homicide at West Tennessee State Penitentiary in a cell occupied only by the victim, Ricky Ardd, and the defendant, Christopher David Hodge.  The defendant was indicted for second degree murder and convicted by a jury of the indicted charge.  Subsequently, the defendant was sentenced as a multiple offender to thirty-five years incarceration at 100%.  The defendant now appeals the conviction, alleging insufficiency of the evidence and error by the trial court in failing to compel discovery of certain Department of Correction records.  Having found no reversible error, we affirm the conviction.

**Factual Background**

Corporal Michael Ottinger, the institutional investigator at West Tennessee State Penitentiary, testified as to the internal functions of Unit 2, where this offense occurred. He explained that Unit 2 consists of four pods with two levels of cells on each pod. In the center is an elevated control room with a view of each pod. The central room is manned constantly by a corporal rank correctional officer. In addition, each pod has a correctional officer assigned to it. All cells are equipped with an emergency call button that, when pressed, alerts an auditory alarm and a visual light in the control room. The control room corporal then dispatches the appropriate pod officer to the alerting cell. Unit 2 houses maximum security inmates and inmates serving a punitive sentence for internal rules violations.

On May 27, 2002, a fight had erupted in the general population units between two rival gangs. Eleven inmates were then transferred to Unit 2 for segregation. In order to accommodate the transfers and insure segregation between gang members, it was necessary to shuffle a number of inmates on Unit 2 to different cells. The victim, Ricky Ardd, though not involved in the fight, was transferred from cell 15, in Pod A of Unit 2, to cell 24, with the defendant as a cellmate. Each cell houses two men and is approximately eight by twelve feet in dimension.

On cross-examination, Corp. Ottinger admitted that he did not personally know whether the call button in cell 24 was operational on the date of the offense.

Dr. O. C. Smith, the Shelby County Medical Examiner, testified as a forensic pathology expert. He had supervised an autopsy that was performed on the victim. He noted that the victim was five feet, six inches tall and weighed 145 pounds. Dr. Smith concluded that the victim died of strangulation. He stated that the victim's neck was scraped and bruised by a ligature. The victim had bled into the muscles of his neck, as well as into the eyeball covering of both eyes. Dr. Smith also noted contusions and abrasions on the back of the neck, contusions of the tongue, and four superficial, non-fatal puncture wounds on the victim's back. He stated that the injuries suffered by the victim, specifically the bleeding into tissues, indicated that the victim did not die an instantaneous death. He stated that the victim did not die of manual strangulation but by the application of a ligature which left marks on the victim's neck. Dr. Smith was shown a long strip of torn bed sheeting attached to a plastic fork that was later introduced as an item seized from cell 24. Dr. Smith opined that the victim's injuries were consistent with strangulation by means of such an instrument. He said that he could not determine the time of death from the autopsy results. He explained that it takes approximately ninety seconds of oxygen deprivation to cause unconsciousness and four minutes of oxygen deprivation to cause death to the brain.

On cross-examination, Dr. Smith admitted that he could not say for certain that the ligature presented caused the victim's death. He also agreed that a sleeper hold can induce unconsciousness in approximately fifteen seconds. On redirect examination, Dr. Smith stated that the victim would be expected to again start breathing if only made unconscious by means of a sleeper hold of fifteen seconds duration.

-2-

Roger Turner, a special agent for the Tennessee Bureau of Investigation, testified as to his role in the investigation of the victim's death. Agent Turner first went to the hospital and took pictures of the victim. He then assisted in a search of cell 24 at the prison. The torn bed sheet strip formerly presented was found during this search.

Sherry Cox was the correctional officer on duty for Unit 2A from 2:00 p.m. to 10:00 p.m. on May 27, 2002. She stated that part of her duties was to perform irregular thirty-minute checks on each cell. She had last checked on the victim's cell at 5:45 and observed no problem. Officer Cox was out of Pod A for fifteen to twenty minutes and when she returned at 6:00 p.m., the defendant called out to her that the victim was unconscious. She saw the victim stretched out on the cell floor with one arm extended and another under his body. Officer Cox issued an emergency call, and medical personnel and yard officers responded. She stated that the defendant had not called out to her prior to the 6:00 p.m. call nor had she been ordered to check the cell by the corporal in the control room. The defendant had, earlier in the day during his shower time, told her that the victim was talking to himself.

Jimmy Moore, a prison nurse, stated he had administered a tuberculosis skin test to the defendant at 4:00 p.m. on May 27th. He observed both the defendant and the victim and stated that the victim was watching and talking to a television. Moore responded to the emergency call at approximately 6:06 p.m. At that time, he detected no pulse on the victim.

Corporal Albert Tracy was the officer in charge of Unit 2 on May 27th on the 2:00 p.m. to 10:00 p.m. shift. He responded to the medical alert at 6:00 p.m. and went to cell 24. The defendant told him that he had been trying to use the call button. Later, Corporal Tracy performed a strip search of the defendant. He observed no injuries to the defendant.

Telly Jones, an inmate, stated that he was a cellmate with the victim prior to the victim's removal to cell 24. He said that the victim objected to being transferred. Jones said he overheard the defendant, during his shower time, ask a guard to check on the victim in cell 24.

Sergeant Vicki Kirby served as chairman of the Disciplinary Board at the penitentiary. She recounted the defendant's statement at the disciplinary hearing as follows: "And the only thing he said to us was that his cell partner was standing at the door, holding his chest, cussing, and that he had been trying to kick on the door and push the call button to notify somebody."

Joe Vernon served as Internal Investigator of the penitentiary. He began his investigation of the victim's death on May 27th. He recounted finding the ligature-type cord attached to the fork in cell 24. He said inmates sometimes use these devices to retrieve items hidden in vents or to pass items from one cell to another. Mr. Vernon admitted that the victim's clothing was not collected as evidence. He said the victim was in the segregated unit for refusing to accept a cell assignment.

The defendant testified that he was twenty-one years old, stood six feet, six inches tall, and was a native of Knoxville. He said he was in the segregation unit for refusal to accept a cell

assignment. He had not known the victim prior to the transfer on May 27th. He said the bedding strip, or fishing line in prison parlance, was in his cell when he moved there. He said it was used to suspend a sheet to provide restroom privacy.

He testified the victim was standing, ranting, and using obscenities after being moved to cell 24. During his shower period, the defendant told Officers Cox and Cahill about the victim's behavior. Later, when the defendant asked the victim to be quiet, the victim spat in the defendant's face and tackled the defendant. The defendant then placed the victim in a sleeper hold and put him on the floor. The defendant said he did this four times and each time he would release the victim, the victim would then get up and attack the defendant again. At one point, the victim attempted to stab the defendant with an ink pen. During this time, the defendant said he repeatedly tried to call out verbally to guards but the noise level from other inmates was too high for him to be heard. When the defendant saw Officer Cox, he told her that medical attention was needed. The defendant said he had no idea that the sleeper hold would kill the victim and he merely intended to render the victim unconscious. On cross-examination, the defendant said he received no injury from the victim's attacks.

Corporal Donald East testified in rebuttal for the State. He was the control room officer for Unit 2 on May 27th. He stated the noise level at 6:00 p.m. that day was "pretty quiet." He also said there were no activations of the call button for cell 24 during his shift that day. The call button for cell 24 was checked the following day and found to be in working order.

On cross-examination, Corporal East said that the pod officer on the floor, Officer Cox, was absent from the pod for fifteen to twenty minutes just prior to the call for medical attention at 6:00 p.m.

**Sufficiency**

The defendant contends that the evidence herein was insufficient to prove that the victim was "knowingly" killed.

When a defendant challenges the sufficiency of the evidence on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This applies to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of the two. State v. Brewer, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

This Court does not reweigh the evidence but we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. § 39-13-201, -210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b).

The undisputed medical evidence in this case attributed the death of the victim to strangulation by means of a ligature. An instrument suitable for a ligature was found in the cell where the victim died. Dr. Smith stated that the victim's injuries were consistent with the use of such an instrument, though he could not say to a medical certainty that this was the ligature used in the victim's homicide. Only the defendant could have been responsible for the victim's death. The jury could, and did, reject the defendant's version of self-defense and embraced the prosecution's theory that the defendant knowingly killed the victim. We hold that the evidence is sufficient to justify a rational jury to find beyond a reasonable doubt that the defendant knowingly killed the victim.

**Discovery**

The defendant contends that the trial court erred in denying certain records requested by the defendant in a motion to compel discovery. The specific requests denied were for all of the individual inmates housed in segregation unit 2A on May 27, 2002, and the defendant's institutional file. The information which would satisfy these requests was, at the time of the pre-trial motion hearing, archived in Nashville and not available at the West Tennessee State Penitentiary. The testimony adduced revealed that inmates' cell locations were not kept on a master list but were only in each individual inmate's file. Researching this information would be daunting in its scope, both in time and expense. It was estimated that the State's expense would be $4000. The basis for the defendant's request was that the victim's former cellmates might corroborate that the victim was an aggressive person.

In denying the defendant's request for discovery of these items, the trial court made the following comments:

> THE COURT: With regard to the other requests, the list of inmates, the Court is not going to require the State to go back and try to reconstruct that.
> The deceased inmate's records, the Court doesn't really feel like that's something that should be required to be turned over to the defendant, since they're not housed here but somewhere else. The Court is going to deny that request with this thought. The issue that the defendant has made available -- or says that he needs to see the records of the deceased for, concerns self-defense. The factors to be decided in determining whether there are reasonable grounds for the defendant to act in self-defense arise from what was known to the defendant. That would include but not be limited to:
> > Any previous threats by the deceased made known to the defendant, the character of the deceased for violence when known to

the defendant, the animosity of the deceased for the defendant as revealed to the defendant by previous action or words of the deceased, and the manner in which the parties were armed and their relative strengths and sizes.

The defendant, if he chooses to testify, can testify to any of those issues, and it would not be relevant for what the defendant might glean from the records of the deceased at this point in time. So therefore, there's no real reason for the defendant to look at the records of the deceased. The only thing that's germane is whatever the defendant knew at the time of the alleged event. So from that reason, that request will be denied.

I guess the State's motion in limine with regard to those records will be granted.

The State had previously filed a Motion in Limine objecting to the introduction of the victim's reason for conviction and the victim's institutional record. The trial court, despite the lack of a written order, apparently orally granted the State's request. The effect was not only to deny the defendant the requested discovery but also to foreclose use of the requested information if gained through the defendant's own investigative methods.

Tennessee Rule of Criminal Procedure 16 provides in pertinent part:
(a) Disclosure of Evidence by the State.
    (1) Information Subject to Disclosure.
        (C) Documents and Tangible Objects - Upon request of the defendant, the State shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the State, and <u>which are material to the preparation of the defendant's defense</u> or are intended for use by the State as evidence in chief at the trial, or were obtained from or belong to the defendant.

(emphasis added).

The trial court refused the discovery and granted the State's motion in limine apparently on the grounds that only what the defendant knew at the time of the event was relevant.

The defendant testified in his own behalf and raised the issue of self-defense through his testimony. This Court in <u>State v. Ruane</u>, 912 S.W.2d 766, 779-82 (Tenn. Crim. App. 1995), conducted a lengthy analysis of the admissibility of prior violent acts by the victim. Therein it was specifically held that:

There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim. If the defendant was unaware of

the prior acts of violence by the victim, the evidence is admissible for corroborative purposes only.

Id. at 779.

The trial court made reference to the requested information being "housed" elsewhere, and the State argues justification for the denial due to the records no longer being present at West Tennessee State Penitentiary. We find this unpersuasive as the information was in State archives under State control.

Ordinarily, the defendant could have obtained at least the individual institutional record of the victim by subpoena. However, the grant of the State's motion in limine would have rendered the exercise moot.

We conclude that the denial of the defendant's request was error in that it, in conjunction with the motion in limine, denied access to the defendant to information possibly material to the preparation of a defense.

However, we also conclude that the error was harmless. Tenn. R. App. P. 36(b). Had this speculative and unproven evidence of prior acts of aggression by the victim been proven, it would have been corroborative in one respect only, that the defendant initially acted in self-defense.

Self-defense. -- (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (1990). Such corroboration could not explain the medical proof that the victim died from at least four minutes of forceful ligature restriction of the victim's oxygen supply. The defendant's version that the victim collapsed from a sleeper hold is completely in conflict with autopsy findings and was rejected by the jury. We do not believe such slight corroborative evidence of self-defense, if produced, would have affected the verdict.

## Conclusion

For the foregoing reasons, we conclude that the evidence was sufficient beyond a reasonable doubt to sustain the defendant's conviction. Furthermore, though we believe the limitation imposed on the defendant's discovery was error, we conclude it was harmless error beyond a reasonable doubt. The defendant's conviction is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE