IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

AUGUST 1999 SESSION

FILED

November 19, 1999

Cecil CROWS ON, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,            )
                              )
          Appellee,           )        No. 03C01-9810-CR-00362
                              )
                              )        Unicoi County
v.                            )
                              )        Honorable Arden L. Hill, Judge
                              )
CONLEY ROSS FAIR,             )        (First degree murder and attempted first
                              )        degree murder)
          Appellant.          )

For the Appellant:                     For the Appellee:

William B. Lawson                      Paul G. Summers
112 Gay Street                         Attorney General of Tennessee
Post Office Box 16                          and
Erwin, TN 37650                        Erik W. Daab
                                       Assistant Attorney General of Tennessee
                                       425 Fifth Avenue North
                                       Nashville, TN 37243

                                       Joe C. Crumley, Jr.
                                       District Attorney General
                                       144 Alf Taylor Road
                                       Johnson City, TN 37601

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

### O P I N I O N

          The defendant, Conley Ross Fair, appeals as of right from his convictions
by a jury in the Unicoi County Criminal Court for one count of first degree murder and
one count of attempted first degree murder. For the first degree murder conviction, the

defendant was sentenced to life in prison, and for the attempted first degree murder conviction, he was sentenced as a Range II, multiple offender, to thirty-five years in prison, to be served consecutively to the life sentence. The defendant was fined fifty-thousand dollars. He presents the following issues for our review:

> (1) whether the evidence is sufficient to support the convictions;
>
> (2) whether the trial court erred by denying the defendant the opportunity to present a prior inconsistent statement made by James Brown;
>
> (3) whether the trial court erred by admitting an edited audiotape and transcript of James Brown's testimony from the defendant's preliminary hearing; and
>
> (4) whether the trial court erred by admitting a videotape of the victim's body.

We affirm the judgments of conviction.

The defendant was convicted of the first degree murder of Bruce Stukey and the attempted first degree murder of James Brown. By the time of trial, Mr. Brown had died of causes not related to this case. However, the jury heard an audiotape of his testimony from the defendant's preliminary hearing, and a transcript was admitted into evidence. At the preliminary hearing, Mr. Brown testified that around 6:30 p.m. on August 14, he drove Mr. Stukey to the defendant's house. He said Mr. Stukey wanted to buy a gun from the defendant, but the defendant said the gun was hidden on Fire Tower Road. He said the defendant stated that Mr. Brown's car could not make the drive and asked Mr. Stukey to come back in an hour, and the two would go to Fire Tower Road to get the gun. Mr. Brown testified that Mr. Stukey did not want to wait an hour, and they drove to Mr. Stukey's house to get Mr. Stukey's truck. He said they then picked up the defendant, and the three of them went to Fire Tower Road around 7:30 p.m.

Mr. Brown testified that Mr. Stukey had no gun or other weapon and that he would have been able to tell if Mr. Stukey had a weapon underneath his clothing. He said the defendant directed Mr. Stukey to Fire Tower Road and had Mr. Stukey pull off the main road near a trail. He said they all got out of the truck and started walking down the trail. He said the defendant led the way, followed by Mr. Stukey, then himself. He said they walked through heavy woods, then veered off the trail on to a walking

2

path. He stated that the path had lots of stickers and brush and that he stopped and told the defendant and Mr. Stukey that he would wait for them because the area was too wooded. He testified that the defendant told him to continue because they were already there.

Mr. Brown testified that he was about twenty feet from the defendant and Mr. Stukey and that as he tried to make his way down the trail toward them, he heard a loud popping noise. He said he looked up and saw the defendant coming toward him pointing a gun toward his head. He said the defendant shot the gun in his direction, then turned and shot Mr. Stukey twice in the back. He said Mr. Stukey had no weapons and had not threatened the defendant. He said Mr. Stukey fell face down, and the defendant came toward Mr. Brown again. Mr. Brown testified that the defendant looked like he had snapped, and he said he started running through the woods, away from the defendant. He said the defendant chased him through the woods and fired four or five more shots at him. He said the defendant stated, "Come here, boy."

Mr. Brown testified that he continued running but that the incline of the mountain was so steep, he fell and slid down part of the mountain. He said he ran for a long time until he no longer heard the defendant chasing him. He said he continued walking and running through the woods but that he had hurt his leg, and it was getting dark. He said that when it became too dark to continue, he sat down and waited for morning. He testified that when it became light again, he continued walking through the woods until he found a trail that led him to a house. He said he found a man who drove him to a convenience store where he called the police. He said that a bullet had grazed his finger.

Mr. Brown testified that all three men had smoked marijuana on the way to Fire Tower Road. He said that several weeks before the shooting, Mr. Stukey had suspected the defendant of stealing money from him. Mr. Brown stated that he had been in a detoxification program for heroin three weeks before the shooting.

Troy Lewis, an officer with the Unicoi County Sheriff's Department, testified that on August 15, 1995, he was dispatched to Jerry's Market. He said that

3

when he arrived, medical personnel were treating Mr. Brown. Officer Lewis stated that Mr. Brown had numerous scratches and a burn on his right middle finger. He said he learned that Mr. Stukey had been shot on Fire Tower Road and that Mr. Brown had spent the night getting out of the woods. Officer Lewis testified that he and Sergeant Harris went to Fire Tower Road on Buffalo Mountain and searched the area. He said they found Mr. Stukey's red truck, and they secured the scene for the Tennessee Bureau of Investigation (TBI).

Ron Arnold, a criminal investigator with the Unicoi County Sheriff's Department, testified that he was dispatched to Buffalo Mountain around 7:30 a.m. on August 15. He said that fifteen to twenty people were searching for Mr. Stukey's body, but they could not find it. He said they learned that Mr. Stukey was wearing a pager, and they decided to call it. He said they located the pager but not Mr. Stukey's body. He testified that he found a trail consisting of Mr. Brown's receipts, cigarettes, and car keys that led to a blood-stained area deep in the woods. Agent Arnold testified that he determined that this was the location of the shooting. He said he assembled a search party to search the immediate area, and Mr. Stukey's body was found about thirty minutes later, about one-quarter to one-half mile from the crime scene. He testified that the body had numerous scratches. Agent Arnold testified that the next day, he returned to the crime scene with a metal detector and found a spent bullet on the ground.

Agent Arnold testified that he learned that the defendant had gone to his sister's house in Dothan, Alabama, but was on his way back to Tennessee. He said that on August 17, he learned that the Johnson City Police Department had the defendant in custody. He said he went to Johnson City to bring the defendant to Unicoi County. Agent Arnold said the defendant was then arraigned and booked and that during the booking process, the defendant removed a piece of paper from his pocket and began to tear it up. Agent Arnold said that another Agent got the letter from the defendant, and they pieced it together. He said the letter was written and signed by the defendant. The letter was admitted into evidence, and in the letter, the defendant admitted killing Mr. Stukey and trying to kill Mr. Brown. He claimed that Mr. Stukey and Mr. Brown took him into the woods to show him a pot plant. He wrote that Mr. Brown struck him from behind, causing him to fall into Mr. Stukey and knock a gun out of Mr.

4

Stukey's pants. The defendant wrote that he fired the gun because he feared for his life.

Agent Arnold testified that after reading the letter, they took the defendant to the emergency room to have him examined. Agent Arnold said he did not notice any injuries on the defendant nor did the defendant complain of any. He said the defendant was not treated for any injuries at the hospital. Agent Arnold testified that after interviewing the defendant's family, he went to 700 E. Maple Street in Johnson City where the defendant had been living with family members. He said he and other officers looked for a gun in the wooded area behind the street. He said they found a gun containing one bullet and a box of ammunition between 632 and 634 E. Maple Street.

Agent Arnold testified that he processed Mr. Stukey's truck for fingerprints but that none were identifiable. He said he found a marijuana pipe containing what appeared to be marijuana residue in Mr. Stukey's truck. He testified that when Mr. Stukey's body was found, it was clothed in a tank top and cotton sweat pants with an elastic stretch band. He admitted that the defendant voluntarily went to the authorities in Johnson City.

Dr. Cleland Blake, the Assistant State Chief Medical Examiner, testified that he performed an autopsy on Mr. Stukey's body on August 16. He testified that the victim died from three gunshot wounds and that he retrieved two bullets from the victim's body. He said one bullet penetrated the front of the victim's left chest, traveling in a downward trajectory and lodging above the rib bone. He said another bullet entered the back through the lower chest area, lodging in a vertebra. He said he found a third wound that entered the back and exited in the front, just under the collarbone. He said this wound caused bleeding in the left chest cavity and penetrated the top of the lung. Dr. Blake testified that the victim lived for as much as one hour after his injuries were inflicted. He said the victim had numerous scratches and bruises. He testified that the first two wounds received were those to the back of Mr. Stukey, with the final wound inflicted at the front of the chest as Mr. Stukey was falling. He testified that the shots were fired from at least three feet away and from a steep angle.

5

Robert Royse, a firearms identification specialist with the TBI, testified that he examined the revolver found in the bushes, the ammunition in the adjacent box, and the bullets that were retrieved from Mr. Stukey's body and from the crime scene. He testified that the bullets from Mr. Stukey's body were fired from the revolver and were the same as the bullet found at the scene. He said the bullets in the ammunition box were also consistent with the bullets from Mr. Stukey's body and the scene.

TBI Agent Shannon Morton testified regarding the extensive search for the defendant's body. He testified that the search was treacherous because of the wooded, rugged terrain on the mountain and the steep incline. Agent Morton also testified regarding the defendant pulling out a letter and ripping it up during booking. His testimony was substantially the same as that of Agent Arnold. Agent Morton testified that the defendant had no visible injuries and made no complaint of injuries.

Diane Trivette, the defendant's sister, testified that the defendant came to her house in Dothan, Alabama, around 1:00 a.m. on August 15. She said he told her that he thought he had shot and killed someone in self-defense. She told him to turn himself in to the police. She did not see any injuries on the defendant.

Cathy Fair, the defendant's sister-in-law, testified that the defendant lived with her and her husband. She testified that the defendant had stated that he was going to get Mr. Stukey and that she told him to let the law handle the matter. She said she saw the defendant on their porch at around 2:00 a.m. on August 15 and that the defendant said, "I did it." She said she did not know what he meant, and she went inside. She said that when she came outside, the defendant said he had killed the victim. She said she remembered making a statement to Agent Morton relating what the defendant told her about that night. In her statement, she said that the defendant told her that he, Mr. Stukey and Mr. Brown went to the mountain and walked down the trail. She said the defendant told her he asked Mr. Stukey why Mr. Stukey had asked the defendant's niece for "a piece of ass." The defendant told her that Mr. Stukey denied making the statement. She said the defendant told her that he called Mr. Stukey a "lying son-of-a-bitch" and shot him in the middle of the chest. Ms. Fair stated that the defendant told her that Mr. Stukey said he would kill the defendant and that Mr.

6

Stukey came toward the defendant. She said the defendant told her that he then shot Mr. Stukey in the heart and that Mr. Brown ran off. She said the defendant told her that Mr. Stukey was trying to crawl away, and he shot him twice in the back.

Ms. Fair stated that the defendant told her that he went through Mr. Stukey's pockets and took sixty dollars, cigarettes, and a lighter. She said the defendant told her that he talked to Mr. Stukey as he was dying and that Mr. Stukey asked the defendant why he shot him and told the defendant that he loved him. She said the defendant told her that he told Mr. Stukey that "no one f***s with my family" and lives.

At trial, Ms. Fair testified that before the defendant left to go with Mr. Stukey on the night of the murder, she knew the defendant was mad at Mr. Stukey for making the sexual comment to her daughter. Ms. Fair testified that the defendant told her that on the mountain, he could not find the keys to Mr. Stukey's truck but that if he had, he planned to take Mr. Stukey to a crack house in Kingsport to make it appear as if he had been killed by drug dealers. She said the defendant told her that he did not chase Mr. Brown down the mountain because he was out of bullets.

Jennifer Gibson, the defendant's niece, testified that on August 11, Mr. Stukey was outside her house in his truck, waiting for the defendant. She said Mr. Stukey asked her "for a piece of ass" and asked her to meet him that night at 8:30. She said the comment scared her because she had been raped twice before, though not by Mr. Stukey. She said she told the defendant about the comment later that day, and the defendant said he would take care of it. She testified that on August 14, the defendant left with Mr. Brown and Mr. Stukey. She said that when the defendant returned, he told her that he had shot Mr. Stukey in the back and killed him because of what Mr. Stukey had said to her.

Eric Alford, a Unicoi County Deputy Sheriff, testified that on August 18, 1997, the defendant initiated a conversation with him following a court hearing. He said the defendant wanted to file a motion to contest the autopsy because the autopsy report was wrong regarding where Mr. Stukey was shot. Deputy Alford testified that the

defendant told him that he shot Mr. Stukey "side by side on the shoulder blade" and that he should know because "he shot the motherf***er." Deputy Alford said the defendant stated that Mr. Stukey had messed with his niece and that a child molester was the worst kind of criminal. He said the defendant stated that he was raised around violence and that when someone messes with him, his first instinct is to kill them. He said the defendant stated, "if it happened to your niece you'd . . . put a bullet in their head."

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions for first degree murder and attempted first degree murder. He argues that the state failed to prove premeditation. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Premeditation is a necessary element of first degree murder. See Tenn. Code Ann. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

8

In the light most favorable to the state, the evidence is sufficient to support the defendant's convictions. Three days before the shootings, Jennifer Gibson informed the defendant that Mr. Stukey had propositioned her, and the defendant replied, "I'll take care of it." He told Cathy Fair that he was going to get Mr. Stukey. The defendant then lured Mr. Stukey and Mr. Brown into a remote, wooded area under the guise of selling Mr. Stukey a gun. When the brush became too thick and Mr. Brown wanted to stop, the defendant encouraged him to continue deeper into the woods with him and Mr. Stukey. The defendant then shot Mr. Stukey and shot at Mr. Brown, chasing him through the woods. Mr. Brown testified that the defendant and Mr. Stukey did not argue before the shootings, nor were they involved in any physical altercation. Cathy Fair testified that the defendant told her he planned to take Mr. Stukey's body to a crack house to make it appear as if Mr. Stukey had been killed by drug dealers. The evidence establishes that the defendant acted with premeditation.

## II. PRIOR INCONSISTENT STATEMENT

The defendant contends that the trial court erred by not allowing him to introduce evidence of a prior inconsistent statement made by Mr. Brown to TBI Agent Shannon Morton. He argues that the trial court's erroneous limitation unfairly infringed upon his right to confrontation. The state admits that the trial court erred by not allowing the prior inconsistent statement but argues that any error is harmless.

Mr. Brown testified at the defendant's preliminary hearing regarding the events of August 14 but died before the trial. The trial court admitted Mr. Brown's preliminary hearing testimony as substantive evidence pursuant to Rule 804(b)(1), Tenn. R. Evid., which provides a hearsay exception for former testimony of an unavailable witness. The defendant tried to admit into evidence an alleged prior inconsistent statement made by Mr. Brown, pursuant to Rule 806, Tenn. R. Evid. However, the trial court ruled that the prior inconsistent statement was inadmissible hearsay.

Rule 806, Tenn. R. Evid., provides as follows:

9

> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

The state admits, and we agree, that if the alleged statement is a prior inconsistent statement, the trial court erred by not admitting it pursuant to Rule 806. Nevertheless, we are constrained to conclude that the error was harmless. See T.R.A.P. 36(b). The defendant made no offer of proof regarding the content of the alleged prior inconsistent statement at trial, and the record before us contains no indication of how the statement was inconsistent with Mr. Brown's testimony. Thus, the defendant has failed to demonstrate either that the proffered statement was inconsistent or that the trial court's ruling affected the outcome of the trial.

### III. ADMISSION OF PRELIMINARY HEARING TESTIMONY

The defendant contends that the trial court erred by admitting the preliminary hearing testimony of Mr. Brown. He argues that a portion of the testimony was redacted but should have been admitted pursuant to Rule 106, Tenn. R. Evid. The state contends that the preliminary hearing testimony was properly admitted.

In the preliminary hearing testimony admitted into evidence, Mr. Brown related the events of August 14. A portion of Mr. Brown's preliminary hearing testimony was redacted and was not presented to the jury in this case. The redacted portion is as follows:

> DEFENSE ATTORNEY: And, you were aware that Mr. Stookey was on parole?
>
> MR. BROWN: Yes.
>
> DEFENSE ATTORNEY: Do you know why he was on parole?
>
> MR. BROWN: I knew he got in trouble over his wife, he was married at one time before he went to jail and he was wanting to get out of the marriage and evidently she'd had him put in jail and I didn't know if it was for assault of [sic] for what reasons it was.
>
> DEFENSE ATTORNEY: Were you aware that it involved firearms?
>
> MR. BROWN: No.

The defendant contends that the redacted portion of the testimony should have been admitted pursuant to Rule 106, Tenn. R. Evid., which provides as follows:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

However, the rule does not allow the admission of everything. "Although Rule 106 permits a party to introduce evidence during the adversary party's case if the evidence in fairness ought to be considered at that time, the rule does not open the door to admission of evidence on any topic." Neil P. Cohen et al., Tennessee Law of Evidence, § 106.2 (3d ed.). Furthermore, the rule generally applies to admit evidence that "qualifies or explains the subject matter of the portion offered by the opponent." Cohen et al. at § 106.2.

In the present case, the defendant has not shown that the redacted testimony relating to the victim's conviction for assaulting his wife explains or qualifies the admitted portion of the testimony. Thus, he has failed to show that fairness required the admission of the redacted testimony contemporaneously with the admitted testimony. Although evidence of the victim's previous conviction for assault may have been admissible at some later point in the trial to support the defendant's self-defense claim that the victim was the aggressor, see State v. Ruane, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), the evidence was not admissible pursuant to Rule 106. Thus, the defendant's claim that the trial court abused its discretion by admitting only a portion of Mr. Brown's testimony and by not admitting the redacted portion is without merit.

## IV. ADMISSIBILITY OF THE VIDEOTAPE

The defendant contends that the trial court erred by admitting a videotape of the victim's body as it was found in the woods. He argues that the videotape was highly prejudicial and of little probative value because similar photographs had already been admitted. See Tenn. R. Evid. 403. The state contends that the trial court did not abuse its discretion in admitting the videotape because the tape shows in greater detail than the photographs the topography of the land, scratches on the victim, and the victim's tight clothing.

11

In <u>State v. Banks</u>, 564 S.W.2d 947, 950-51 (Tenn. 1978), our supreme court held that the determination of the admissibility of photographs of a murder victim is within the discretion of the trial court after considering the relevance, probative value and potential unfair prejudicial effect of such evidence. <u>See</u> Tenn. R. Evid 403. We believe the same principles apply to the admissibility of a videotape of a murder victim. The general rule, as stated in <u>Banks</u>, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." 564 S.W.2d at 950-951. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." <u>Id.</u> at 951.

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. <u>Id.</u>; <u>see also</u>, Tenn. R. Evid. 403. In <u>Banks</u>, the court stated, "The more gruesome the photographs, the more difficult it is to establish their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951.

We have reviewed the videotape in the present case and hold that the trial court did not abuse its discretion in admitting the tape. The videotape is somewhat gruesome in that at one point, it shows the victim's body surrounded by flies and depicts a yellowish substance covering the victim's eyes, mouth and nose. Testimony at trial referred to the yellowish substance as maggot infestation, although from our review of the videotape, such is not readily apparent.

In any event, our review supports the trial court's determination that the probative value was not outweighed by any prejudicial effect. Although photographs depicting the victim's body were admitted, the photographs are dark and provide little detail. The videotape, on the other hand, clearly shows the numerous scratches on the victim's body and the tight-fitting clothes worn by the victim. These details are relevant because they support the state's theory that the victim was attempting to flee the wooded area when he was shot in the back and rebut the defendant's claim that the victim concealed a weapon in his clothing.

12

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
John Everett Williams, Judge


_____
Alan E. Glenn, Judge

13