# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 2000 Session

## STATE OF TENNESSEE v. SAMUEL PEGUES

**Appeal from the Circuit Court for Madison County**
**No. 98-695     Franklin Murchison, Judge**

------

**No. W1999-01865-CCA-R3-CD - Filed October 11, 2000**

------

The Defendant, Samuel Pegues, was convicted of second degree murder after a jury trial. In this appeal as of right, the Defendant asserts that the evidence presented at trial is insufficient to sustain his conviction, that the trial court erred by denying proposed testimony regarding statements made by the victim on the night of the incident, and that the trial court erred by excluding the Defendant's testimony regarding statements made by the victim that she had stabbed or cut someone. We conclude that the evidence is sufficient to sustain the conviction, that the trial court did err by denying the proposed testimony of statements made by the victim but that such error was harmless, and that the Defendant has waived his issue regarding the statements of the victim that she had stabbed or cut someone. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN, and CORNELIA A. CLARK, SP. J., joined.

Daniel J. Taylor, Jackson, Tennessee, for appellant, Samuel Pegues.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Jerry Woodall, District Attorney General; and Donald H. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The State's proof at trial established that police were dispatched to 124 Davis Street in Jackson, Tennessee during the early morning hours of June 16, 1998. Upon arrival, the police observed the body of a deceased black female on the floor of the kitchen. The victim, later identified as Barbara Jean Hardin, appeared to have a small wound to her chest area. The victim was discovered in the kitchen near a bedroom area. There was an overturned chair in the kitchen, an overturned vacuum cleaner in the living room, a torn curtain in the kitchen, and various knives and forks on the floor of the kitchen. A small, right handed "paring type knife" was found lying on the

kitchen floor, a small knife was found lying on the living room floor near the entrance to the kitchen, and a butcher knife was found lying just inside the bedroom area off the kitchen.

Officer Charles Mathis, an officer with the Jackson Police Department, testified that after arriving at the scene, he encountered Mr. James Clifford Williams, the owner of the house, who was walking toward the house from across the street. After talking to Mr. Williams, Officer Mathis went to a nearby residence to look for the suspect. Officer Mathis knocked on the door, and the owner of the house answered the door and allowed Officer Mathis and other police officers to enter. Officer Mathis testified that the officers found the Defendant in the house asleep in the bedroom. After the Defendant was taken into custody, Officer Mathis started searching the area outside the house for a weapon. He said that he found a .22 caliber revolver lying between two pieces of plywood near the front door.

Dr. Tony Emison, the Medical Examiner for Madison County, testified that he examined the body at the scene at 6:30 a.m. on June 16, 1998 and pronounced Ms. Hardin dead. He later examined the body at the hospital, but he did not perform an autopsy. Dr. Emison said that in his opinion, Ms. Hardin died from a gunshot wound to the chest. He stated that he did not observe any soot or stippling on the clothing or the body of the victim, which led him to conclude that the victim was shot from a distance of at least three feet. He also testified that the amount of soot and stippling at various distances would vary depending on factors such as the caliber of the weapon used. Dr. Emison stated that there did not appear to have been any movement by the victim after she was shot. He further testified that he had been to forensic seminars, but had not received any other forensic or ballistics training.

Lucy Fuller, who lived at 145 Davis Street near Mr. Williams, testified that the Defendant knocked on her door during the early morning hours of June 16, 1998. He asked her to call 911 because "some girl across the street was having a heart attack." Ms. Fuller did not have a telephone, so she told the Defendant to ask next door. He then attempted to ask someone next door to call 911, but only children were awake. He told the children to have their parents call 911, then "walked around the front porch for a minute. Rubbed his head and acted like he was nervous and stuff, and then he left."

Investigator J.R. Golden with the Jackson Police Department testified that he interviewed the Defendant at the police department around 11:15 a.m. on June 16, 1998. The Defendant waived his Miranda rights and agreed to talk to Investigator Golden. The Defendant gave Investigator Golden a statement, which Investigator Golden wrote down in his handwriting. After he was finished, the Defendant was given an opportunity to review the statement and make any additions or corrections. The Defendant made no changes, and then he signed the statement. The statement, as recorded by Investigator Golden, provided as follows:

On Monday, June the 15th, 1998, I went over to Clifford [sic] house on Davis Street. This was around 4 p.m. I help [sic] Clifford clean up a room. Me and Jerome went and got some beer and came back to Clifford [sic] house. As we was cleaning up the

house we were drinking the beer. After we got through cleaning up the house, I stay [sic] there for a while.

Later on me and Clifford went to find a ride, and I went to Clifford [sic] brother [sic] house. I called Barbara Jean Hardin and told her that Clifford was going to help me get a job. Bobbie asked me if I was coming home, and I told her yes. I told her that I love her. About dark Bobbie Jean came over to Clifford [sic] house. I had told her where I was going to be at.

We all just sat around drinking some beer. Me, Clifford, Bobbie Jean and some girl. I don't know her name, but Clifford do [sic]. Clifford left and went to his brother [sic] house down the street. Bobbie Jean told me that I was going home. I told her that I was going to spend the night with Clifford because we was going to work on 6/16/98, Tuesday. Bobbie Jean said that I was going home with her. I told her again that I wasn't going with her. Bobbie Jean pulled out a knife on me telling me that I was going home. By then Clifford came back to the house.

I left the house and went to Mound City Lounge and bought some more beer. Bobbie Jean was with me. After I bought the beer we went back to Clifford [sic] house and drank it. Later on Bobbie Jean started arguing with me again about going home. Clifford told her that she needed to stop arguing. I went into the living room with Clifford. Bobbie Jean was in a back room. After I got into the living room Bobbie Jean came in behind me. She had a knife in her hand telling me that I was going home with her.

Bobbie Jean started around the coffee table at me. That [sic] when Clifford told her that she had to leave, but she said that she wasn't going to leave without me. I had a gun in my pants and I pulled it out and held it to my side toward the floor. Clifford asked her to leave again that [sic] he was going to call the police. While Clifford was gone to call the police Bobbie Jean came at me with the knife. I grabbed her, while she had the knife in her hand trying to take it. We were in the living room struggling then end [sic] up in the kitchen. Bobbie Jean pick [sic] up a knife and I rushed her and she was trying to stick me. As we were struggling the gun went off. Bobbie Jean said you shot me and she fell to the floor. I ran out of the house to call the police. I saw two police car and I went to Wayne Buchanan [sic] house. I hid the gun next to Wayne Buchanan [sic] house under some woods. It was a 22 revolver type gun. I did not mean to shoot Bobbie Jean.

This essentially concluded the State's proof.

James Clifford Williams was unable to be located, and the parties stipulated that his prior testimony from the preliminary hearing in this matter could be introduced as evidence. The defense played the preliminary hearing tape for the jury. On that tape, Mr. Williams testified that the Defendant was at his home on June 15, 1998 and was helping him clean out a room for Williams' new baby. Ms. Hardin came over that day and began arguing with the Defendant. Mr. Williams stated that Ms. Hardin wanted the Defendant to give her the clothes he had on, but then she would

not let the Defendant take off the clothes when Mr. Williams offered to loan him some to put on. Ms. Hardin wanted the Defendant to leave with her.

Mr. Williams testified that the argument between the Defendant and Ms. Hardin continued off and on throughout the evening. Ms. Hardin did most of the talking, and the Defendant would just shake his head and say, "why don't you go on, and stop this." Mr. Williams asked Ms. Hardin to leave, but she would not. He then asked both of them to leave. Mr. Williams said that Ms. Hardin had a knife in her hand, which she had covered up with a shirt that the Defendant had been wearing previously but had taken off. Mr. Williams saw Ms. Hardin throw a knife on the table, and then he again told both of them to leave. The Defendant displayed his gun when Ms. Hardin "rushed toward him," trying to grab him, but he did not point the gun at Ms. Hardin. The Defendant told Mr. Williams that Ms. Hardin had another knife. At this point, Mr. Williams told them that he was going to go call the police to make them leave, and he left the house. He did not return until the police arrived.

Wayne Buchanan testified that the Defendant came to his house on June 16, 1998 early in the morning while it was still dark. He and the Defendant had known each other for three or four years. Mr. Buchanan was asleep on the couch when the Defendant arrived. He testified that the Defendant was crying and nervous. After talking to the Defendant, Mr. Buchanan left to try to call the police or an ambulance, but all of his neighbors were asleep. The Defendant stayed at his house until the police arrived. The Defendant was lying on the bed when the police entered. Mr. Buchanan said that the Defendant cooperated with the police.

Dr. O'Brien Clary Smith, an associate professor of pathology at the University of Tennessee in Memphis and the Deputy Chief Medical Examiner for western Tennessee, testified that he performed an autopsy on Ms. Hardin. He said that Ms. Hardin was five feet three and one-quarter inches tall, and she weighed 214 pounds. At the time of her death, Ms. Hardin was under the influence of cocaine. Dr. Smith indicated that the amount ingested by Ms. Hardin would have a "very elevating-type effect on the mental functions and on the physical activity."

Dr. Smith maintained that Ms. Hardin died from a single gunshot wound to her chest. Ms. Hardin had been shot with a .22 caliber bullet. Dr. Smith indicated that Ms. Hardin would have been able to walk and talk and move for several minutes after being shot. Because he did not find evidence of soot or stippling on Ms. Hardin's body or the clothes she was wearing, Dr. Smith opined that Ms. Hardin would have been at least two feet from the muzzle of the gun when she was shot.

The Defendant testified at trial in his own behalf. He said that he and the victim, Barbara Jean Hardin, had been dating and living together off and on for about eight months prior to the shooting. On June 15, 1998, the Defendant went to the home of Clifford Williams to help Mr. Williams clean the house in preparation for his infant child to come home from the hospital. At some point, the Defendant called Ms. Hardin to let her know where he was. He told Ms. Hardin that he would return to her home later that evening, but he did not intend to do so. He said he did not want to go back to Ms. Hardin's house because of her "violence." He said that the day before this

incident, Ms. Hardin had hit him in the head with a "big piece of wood" that had "broke[n] off a tree." The Defendant had not returned home since that occurred.

Later on the evening of June 15, Ms. Hardin arrived at Mr. Williams' house. After Mr. Williams left for a brief period, she began arguing with the Defendant about a girl that was also at Mr. Williams' house. The Defendant stated that Ms. Hardin obtained a knife from the kitchen, but she put it back when Mr. Williams returned. The Defendant and Ms. Hardin began arguing again when the Defendant told Ms. Hardin that he was going to spend the night at Mr. Williams' house so that he could work with Mr. Williams in the morning. Ms. Hardin wanted the Defendant to leave with her.

The Defendant stated that when Mr. Williams returned, Mr. Williams gave him money to go get some beer. He and Ms. Hardin then walked to the Mound City Lounge, where the Defendant bought some beer. They returned to Mr. Williams' house, where they drank the beer. Later, they continued arguing because Ms. Hardin wanted the Defendant to leave with her. When he would not leave, she demanded that he give her the clothes he had on. The Defendant stated that he took off the big shirt he had on and gave it to her, but he had a T-shirt on underneath. Mr. Williams offered to loan him some clothes, so he went to the bedroom and tried to change, but Ms. Hardin would not let him. He then returned to the living room, with Ms. Hardin following him.

The Defendant testified that he became aware that Ms. Hardin had a knife because there was a butcher knife on the kitchen counter when he walked through the kitchen on the way to the living room, but that knife was gone after Ms. Hardin walked through the kitchen. He said that Ms. Hardin had covered her hand with the shirt he had taken off. He was on one side of the coffee table in the living room with his back to the wall, and she was on the other side of the table. She came at him a couple of times, and he backed toward the wall. Mr. Williams was standing in the doorway to the living room. After the Defendant told Mr. Williams that Ms. Hardin had a knife, Ms. Hardin put one knife down on the table. The Defendant said that he knew she had another knife because the knife she put on the table was not the knife he noticed missing from the kitchen. Mr. Williams told them both to leave. The Defendant said that he tried to leave, but Ms. Hardin blocked his exit every time. He stated that he carried a pistol for protection and that he displayed that pistol when Ms. Hardin had the knife, but he did not point it at her.

The Defendant stated that he told Mr. Williams that Ms. Hardin had another knife under the shirt. Mr. Williams again told them to leave and then left to call the police. Instead of leaving, they continued arguing. The Defendant testified that Ms. Hardin took the shirt off her arm, laid the butcher knife on top of the refrigerator, and put the shirt on. He said that Ms. Hardin said she would leave before the police got there, but she wanted her things. When the Defendant began to untie his shoes, Ms. Hardin grabbed the knife and "rushed" at him. The Defendant said that he grabbed her arm and they started "tousling." They "tousled on in the kitchen," where Ms. Hardin dropped the big knife, knocked over a cup of knives and forks, and tore down the curtains. He said that Ms. Hardin grabbed a knife and tried to "stick" him with it. The Defendant again grabbed Ms. Hardin's arm. He said that she "jerked away" from him, then came at him again with the knife, which he referred

to as a "steak knife." At this point, he again pulled out his pistol. He said that he told her, "Stop, Bobbie Jean," but she kept coming toward him. When she kept coming toward him, he pulled the trigger. He said she was about three or four feet away from him when he pulled the trigger. Ms. Hardin said, "Oh, you shot me," and then she dropped the knife, turned around, and walked back to the edge of the kitchen, where she laid down. The Defendant said he then left to try to call an ambulance.

The Defendant went to Lucy Fuller's house in an attempt to get an ambulance. He said that he told Ms. Fuller his girlfriend was having a heart attack because he was scared. When Ms. Fuller said she did not have a phone, the Defendant told some kids next door to call an ambulance, but they did not do so. The Defendant then went to Wayne Buchanan's house and woke up Mr. Buchanan. They then knocked on more doors, but no one would answer. The Defendant said he placed the gun between two boards on the side of Mr. Buchanan's house. He went into Mr. Buchanan's house and laid down across the bed. He stated that he was crying and scared. He heard the police sirens while he was in the house. He stayed on the bed until the police arrived. The Defendant stated that he was not asleep and that he cooperated with the police.

The Defendant further testified that he did give a written statement to Investigator Golden. When asked why he told Investigator Golden that the gun accidentally "went off," he replied, "Sir, I didn't mean it went off. What I meant is I shot her, but I didn't mean to kill her. I just wanted to stop her from stabbing me. That's what I meant."

The Defendant was permitted to testify about prior instances of violence on the part of Ms. Hardin against him, in addition to the instance in which Ms. Hardin hit him in the head with a piece of wood. He testified about one incident, which he said occurred at a location near the "old Martha White plant" about two weeks before the shooting. The Defendant and Ms. Hardin got into an argument, and Ms. Hardin ripped a T-shirt that he had on. Ms. Hardin then picked up a beer bottle, broken it, and cut his throat with it. The Defendant said that blood began running down his chest. He testified that he picked up a stick to defend himself from the beer bottle, but he did not swing it at her. Ms. Hardin grabbed the stick and threw it down. The Defendant then left and went to his niece's house, which was nearby. He said that this incident was witnessed by a security guard for the Martha White plant.

The Defendant also testified about another incident, which occurred about three months prior to the Martha White incident, in which Ms. Hardin cut his shoulder with a butcher knife. He said that he did not call the police about these incidents because he did not want Ms. Hardin to "get in trouble." He showed the jury a scar which was on his throat and another scar which was on his shoulder, and told the jury that these scars were the result of injuries inflicted by Ms. Hardin.

Marvis Woods, the Defendant's niece, testified that she lives near the Martha White plant. She said that during the summer of 1998, the Defendant came to her house, and he had a cut on his throat. He was bleeding, and she gave him a towel. He stayed for about five or ten minutes until the bleeding stopped.

John Patty, a security guard employed by Maxxguard, testified that he was working at the Martha White plant in June of 1998. He said that one morning he witnessed an argument between the Defendant and Ms. Hardin near the Martha White plant. He said that he saw the Defendant walking away from Ms. Hardin's house, and Ms. Hardin was following him. Ms. Hardin was yelling, "If you leave I will kill you." The Defendant was "just trying to keep her real calm, trying to work things out with her." Mr. Patty said that Ms. Hardin was yelling, but the Defendant stayed calm and did not raise his voice or his hand. Mr. Patty testified that he saw Ms. Hardin pick up a beer bottle, crack it over the curb, and start swinging it at the Defendant. The Defendant picked up a stick to protect himself, and he knocked the beer bottle out of her hand. Ms. Hardin became more angry and grabbed the stick from the Defendant's hand. She then started hitting him with the stick, and he put up his hands in defense. The Defendant got the stick back from her and threw it to the ground. Mr. Patty said that he called the police, but the Defendant and Ms. Hardin had left in different directions. He did not see the Defendant get cut with the beer bottle.

## SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the sufficiency of the convicting evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The Defendant was convicted of second degree murder, which is a knowing killing of another. See Tenn. Code Ann. § 39-13-210(a)(1). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware

of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

There was no dispute that the Defendant shot and killed Ms. Hardin. The State established that Ms. Hardin was shot from a distance of three feet or more. There was also proof that the Defendant carried a pistol, that he had displayed the pistol that evening, and that he ultimately shot the victim once with the pistol. The Defendant then left the location of the shooting and placed the weapon between two pieces of plywood. Although he sought help for Ms. Hardin, the Defendant did not admit at first that he shot her. He told Ms. Fuller that she was having a heart attack. A rational jury could have concluded from this evidence that the Defendant was reasonably certain when he shot Ms. Hardin that her death would be the result of the gunshot. Thus, the evidence was sufficient to support the conviction for second degree murder.

Notwithstanding, the Defendant asserts that at most the proof established that he was guilty of the lesser included offense of voluntary manslaughter. The Defendant's theory at trial was that he was acting in self-defense. The jury was instructed on both self-defense and voluntary manslaughter. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a). The self-defense statute provides that "[a] person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." Id. § 39-11-611. While the Defendant did introduce proof of provocation and self-defense, the jury obviously rejected the Defendant's proof. The jury had the opportunity to judge the credibility of witnesses and resolve any conflicts in the testimony, and it resolved those in favor of the State. Because the State's proof sufficiently established the elements of second degree murder, the evidence is sufficient to support the conviction.

## PROPOSED TESTIMONY OF MAYDEL WOODS

The Defendant next asserts that the trial court incorrectly excluded the proposed testimony of Ms. Maydel Woods, the Defendant's mother, regarding threats made by Ms. Hardin against the Defendant. During a jury-out hearing, the defense made an offer of proof, wherein the Defendant indicated that his mother would testify that Ms. Hardin called her on the day of the shooting looking for the Defendant. Ms. Hardin told Ms. Woods, "I'm going to kill him, and I'm going to do something bad to him when I find him." The Defendant argued that this statement was admissible as a statement against interest and that there were other ways the statement could come in as well, but the trial court determined that the statement was inadmissible because the Defendant was never aware that Ms. Hardin made the statement.

On appeal, the Defendant asserts that the proposed testimony should have been admitted for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor. In State v. Ruane, 912 S.W.2d 766 (Tenn. Crim. App. 1995), we held that evidence of a victim's violent

conduct toward third persons is admissible for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor, even when the defendant is unaware of that violent conduct. See id. at 779-82. The State concedes that Ruane would permit the introduction of the proposed testimony of Maydel Woods, but argues that the exclusion of this testimony was harmless. We agree.

Under the harmless error doctrine, "[r]eversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice." State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998); see also Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Although the testimony of Ms. Woods that the victim, Ms. Hardin, had threatened to kill or harm the Defendant when she found him should have been admitted as corroborative proof that Ms. Hardin was the first aggressor, its exclusion was harmless. There was a plethora of evidence introduced showing that Ms. Hardin was the first aggressor. In both the Defendant's statement to police and his testimony at trial, he indicated that Ms. Hardin started the fight and that she came after him with a knife. Mr. Williams testified that Ms. Hardin started the arguments with the Defendant and that she had a knife. The Defendant testified about prior instances of violence by Ms. Hardin towards him, which were corroborated in part by the testimony of Marvis Woods and John Patty. Thus, the jury had an abundance of proof from which it could have determined that Ms. Hardin was the first aggressor and that the Defendant was acting in self-defense. It chose to reject that theory and convict the Defendant of second degree murder. We cannot say that this evidence about one additional threat would more probably than not have affected the judgment.

## TESTIMONY THAT VICTIM HAD PREVIOUSLY CUT OR STABBED SOMEONE

Finally, the Defendant argues that the trial court erred by excluding the proposed testimony of the Defendant that Ms. Hardin had told him that she had "cut" or "stabbed" a "girl." The Defendant did not know any details of the incident. At trial, the defense argued that this testimony was relevant to the Defendant's mental state because it was additional evidence that the Defendant knew of the victim's violent propensities. The trial judge originally commented that the testimony was admissible, but then changed his mind and excluded the proposed testimony.

The Defendant did not, however, raise this issue in his motion for a new trial. Therefore, this issue has been waived. Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988). Nevertheless, the Defendant urges us to consider the issue as plain error. Tennessee Rule of Criminal Procedure 52(b) provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." We do not believe that the exclusion of the Defendant's testimony that the victim had previously cut someone, if error at all, affected the Defendant's substantial rights. As previously noted, the Defendant offered an abundance of proof establishing that the victim was the first aggressor. The jury rejected that theory, and more evidence on the issue would have been unlikely to affect the result.

CONCLUSION

We conclude that the evidence is sufficient to support the Defendant's conviction, that the trial court erred in excluding the proposed testimony of Maydel Woods regarding threats made by the victim but that such error was harmless, and that the Defendant waived consideration of whether the trial court erred in excluding the proposed testimony of the Defendant that the victim had previously cut or stabbed a person.  Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE