IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 21, 2010 at Knoxville

## STATE OF TENNESSEE v. SAMUEL SHERRILL

**Appeal from the Circuit Court for Wayne County**
**No. 14503   Jim T. Hamilton, Judge**

———————

**No. M2009-01979-CCA-R3-CD - Filed April 21, 2011**

———————

The Defendant, Samuel Sherrill, was indicted for second degree murder, a Class A felony. Following a jury trial, the Defendant was convicted of reckless homicide, a Class D felony. The trial court sentenced the Defendant to four years in the Tennessee Department of Correction. In this appeal as of right, the Defendant contends that the trial court erred in refusing to admit testimony from two witnesses regarding the victim's specific acts of prior violence in support of his assertion that the victim was the first aggressor. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Stanley K. Pierchoski, Lawrenceburg, Tennessee, for the appellant, Samuel Sherrill.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Mike Bottoms, District Attorney General; and Joel Douglas Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Although the Defendant is not challenging the sufficiency of the convicting evidence, we will provide the following factual summary to establish context for the Defendant's issue on appeal. On August 2, 2008, the Defendant walked to the victim's apartment, where the Defendant and the victim drank a few beers and other alcoholic beverages. Later, Charles Leon Thompson, Jr. and Danny James Dodd, Sr. drove to the victim's apartment, where they

picked up the Defendant and the victim to take them to Bumper's Bar. Mr. Thompson and the group arrived at the bar at approximately 8:30 p.m.

Once at the bar, the four men consumed beer. While at the bar, the victim asked Mr. Thompson to drive him to Alabama to purchase some liquor, and Mr. Thompson complied. While Mr. Thompson and the victim were gone, Mr. Dodd and the Defendant consumed more beer. Eventually, another patron at the bar asked the Defendant if he wanted to trade shirts. The Defendant agreed and removed his shirt. At this point, Mr. Thompson and the victim had returned to the bar and saw that the Defendant was unclothed and arguing with the other patron. In an effort to avoid a physical confrontation, Mr. Thompson talked the group into leaving. The four left, and Mr. Thompson drove the Defendant and the victim back to the victim's apartment before returning to the bar with Mr. Dodd.

On August 4, 2008, the victim's niece, Tracy Darling, drove to the victim's apartment. When she arrived, she saw that the "big door" was open but that the "screen door" was shut. Ms. Darling knocked on the screen door, and after receiving no response, she went into the apartment. Inside the apartment, she observed the victim, who appeared as if he had fallen out of his chair and landed on the floor. The victim's shirt had ridden up, exposing his back. Judging from the color of the victim's back, she assumed that "it wasn't good." She left the apartment and called 9-1-1.

Investigator Kenneth Rippy of the Collinwood Police Department was called to investigate the victim's death. Upon seeing the victim and the living room in which the victim was found, Investigator Rippy believed that "there had been a struggle or an altercation inside" the apartment. There was blood on the closet door, the wall, and the floor. There was also a "smear" of blood on the front storm door. The victim's face was bloody, and his eyes were "black" and bruised. A chair was overturned, and the coffee table had been pushed aside. The victim was wearing a watch, and his wallet was in his back pocket. Investigator Rippy searched for weapons but did not find any in the residence. Investigator Rippy found a "pint bottle of margarita mix," a cup of whiskey, and Hydrocodone pills.

Agent Vance Jack of the Tennessee Bureau of Investigation also assisted in the investigation. Agent Jack found "at least two distinct separate patterns" of blood spatter in the apartment. From this finding, he was able to determine that the victim had been hit at least two times and that the victim would have been on the floor when he was hit.

As the investigation progressed, the Defendant became a suspect. Investigator Rippy contacted the Defendant, and he and Agent Jack eventually located the Defendant at a Long John Silver's restaurant in Savannah, Tennessee. The Defendant had blood on his tennis

shoe and on the back of his leg.[1]   The Defendant agreed to leave with them and asked whether the victim had died from a medical condition.  The Defendant then said, "I didn't think I could kill somebody with my bare hands."  Once at the Savannah Police Department, the Defendant agreed to give a taped statement.

The Defendant stated that after Mr. Thompson and Mr. Dodd dropped him and the victim off at the victim's apartment, he went inside the apartment with the victim.  He said that he asked the victim about the victim's former roommate, Clifford Stults, who had died.  He explained that Mr. Stults had been dead for some time before the victim called 9-1-1.  When he asked the victim about this, the victim became "hostile."  The victim grabbed him "by the hair of [his] head" and told him that "he was going to blow [his] f - - - - - g brains out, like he did Clifford."  He said that after the victim grabbed him, he fell to the floor and hit his head "pretty hard" on the floor.  He stated that an "altercation . . . went down" at that point before he ran out the door.  He stated, "I couldn't believe anybody would kill nobody just with their bare hands."  He admitted that he knew that he hit the victim more than one time but that he only hit the victim because he was trying to prevent the victim from reaching the gun under the chair.

After the Defendant was arrested and charged with second degree murder, Jason Duke, the jail administrator of the Wayne County Sheriff's Department, photographed the Defendant in an effort to document any wounds that might have occurred as a result of the alleged altercation with the victim.  However, Mr. Duke was unable to find any wounds on the Defendant's person.  When asked if he had any wounds that were not visible, the Defendant told Mr. Duke that he did not have any wounds.

Dr. Staci Turner, an assistant medical examiner for Tennessee, performed the victim's autopsy on August 5, 2008.  From her examination, she determined that the victim died as a result of blunt force head and neck injuries.  The victim's "most serious and lethal injury was a fracture of the neck which resulted in a bruise or contusion of his spinal cord."  As a result of this injury, the victim would have lost the ability to move and would have gradually stopped breathing.  The victim also had scrapes, bruises, and lacerations on his face and "some scrapes on his right arm and right knee."  She determined that the victim had likely received "at least three" blows given the "areas of injury on his face" but that the victim could have been struck more than three times.  The victim had been hit on the left side of the forehead, on the lips, and near the right cheek and ear.  While Dr. Turner determined that the victim's neck injury had caused the victim's death, she could not determine which of the three blows had caused the neck injury.  Dr. Turner examined blood taken from the victim's

---

[1]There was some confusion as to whether the blood was found on the Defendant's pants or on his leg.

heart and found that the victim's blood alcohol content was .164. However, testing of the vitreous fluid taken from the victim's eyes indicated that his blood alcohol content was .226.

Gayle Odle, the victim's ex-wife, testified at trial that she saw the victim approximately three times a week and that she helped him with his groceries and laundry. She explained that the victim's back and shoulder had been broken and that he had had a stroke. As a result of his injuries and the stroke, the victim was not able to fully use his arms. The victim was unable to put a seatbelt on when riding in a car and had trouble tying his shoes and putting his socks on his feet. The victim had also spent a significant amount of time in a nursing home in Waynesboro. After his health improved some, the victim left the nursing home and returned home approximately three months before his death. Although he had left the nursing home, he still had trouble walking, caring for himself, breathing, and using his arms. Ms. Odle stated that she continued to care for him but explained that the victim was an alcoholic and that he began drinking again after he returned home. She stated that she did not visit the victim as often when he was drinking but that she had visited him before his death.

Ms. Odle stated that the victim called her on August 3, 2008, at approximately 1:00 a.m. The victim told her that he had a problem and explained that the Defendant was refusing to leave the house. The victim told her that he would call her back. The victim called her less than five minutes later and told her that he would "take care of this." As he was talking to her, he yelled at someone and told them to get out of the refrigerator because the beer was gone.

Kimberly McFall, the victim's daughter, testified that she also cared for the victim. She stated that the victim had "very limited use of his arms and hands" as a result of his medical problems. She had to take him to the store and had to help him carry his groceries in the house. She stated that the victim even had a hard time dressing himself and that he "had almost no muscle tone" in his "upper body." She explained that a few days before he died, she had to help him fasten a pair of shorts that she had bought for him.

Dr. Esmeraldo Herrera testified that the victim was one of his patients at his family practice. Dr. Herrera stated that the victim suffered from a variety of medical conditions, including

> [H]ypertension, coronary artery disease, chronic obstructive pulmonary disease, depression, osteoarthritis, alcoholic dementia, cerebral vascular accident, traumatic injury to the right shoulder with decreased range of motion and forty percent abduction, leg affect weakness and tingling of the right foot and right hand secondary to the stroke[.]

-4-

He further stated that it was his medical opinion that due to the victim's condition, the victim "did not have the physical strength to engage in any physical confrontation" and that "due to the right side pain and weakness, [the victim] could not have defended himself successfully" if he were involved in a physical altercation. Dr. Herrara explained that given the victim's decreased range of motion and abduction percentage, it would have been difficult for the victim to outstretch his arms more than 40 percent away from his body. He further explained that even if the victim were able to raise his arms at 40 percent or more than 40 percent, he would not have been able to maintain his arms at that level for an extended period of time.

On cross-examination, Dr. Herrara testified that the victim had been prescribed a variety of medications for his physical conditions and that the victim should not drink alcohol while taking these medications. As to the victim's physical condition, Dr. Herrara explained that with the aid of the medication, the victim's range of motion would have improved. He further explained that while the victim could have engaged in a physical confrontation, he would have experienced pain if he were not taking his medication as prescribed. He admitted that the victim could have picked up a handgun and held it. On re-direct examination, Dr. Herrara stated that the victim could initiate a fight. However, he explained that even if the victim were taking his medications as prescribed, the victim would still not have the strength to sustain himself long enough to win the confrontation.

Roy Neal Robertson, the Defendant's former roommate, testified for the defense. Mr. Robertson stated that the Defendant left the house at approximately 2:00 p.m. on August 2, 2008. The Defendant was wearing a blue denim shirt with writing on the back and fringes on the side, blue jeans, and tennis shoes. Mr. Robertson did not see the Defendant again until approximately 12:00 p.m. on August 3, 2008. The Defendant was wearing a white t-shirt with black writing on the front, blue jeans, and tennis shoes. Mr. Robertson did not see any blood on the Defendant's clothing. The Defendant told Mr. Robertson that he had sold his shirt to a man who had offered him $20. On August 4, 2008, Mr. Robertson drove the Defendant, who was wearing the same white t-shirt he had worn the previous day, to Lawrenceburg, Tennessee. At some point during the day, the Defendant told Mr. Robertson that "he had been into it with [the victim] and he had hit [the victim]."

The Defendant testified that he and the victim had been friends for approximately 40 years. He stated that before they left with Mr. Dodd and Mr. Thompson, the victim had taken a shower and dressed himself. When they returned to the victim's apartment that night, the victim was upset with the Defendant because they had to leave the bar. However, they continued to drink while at the victim's apartment. The Defendant had another beer, while the victim drank whiskey. The Defendant stated that at that point, he "had a buzz going."

He stated that the victim was not "heavy drunk" but that the victim "had a pretty good buzz going" and was "running his mouth a little bit."

The Defendant stated that the victim brought up an earlier conversation that they had when the victim was in the nursing home. The victim had told the Defendant that he should shoot Mr. Robertson and place the gun in Mr. Robertson's hand. The victim said that the Defendant would inherit Mr. Robertson's property and that he could move in with the Defendant instead of having to live in the nursing home. While at the apartment on August 2, 2008, the Defendant asked the victim whether he had killed his previous roommate, Mr. Stultz, in the way that he had suggested that the Defendant kill Mr. Robertson. The victim did not respond. Approximately an hour later, the victim told the Defendant to leave. The Defendant refused, stating that he could not leave because he was intoxicated and that if he were caught, he would be arrested for violating the rules of his probation.

The Defendant was sitting on the edge of the couch, facing the victim when the victim admitted that he had killed Mr. Stultz and said, "I'll blow your f - - - - - g brains out just like I did Clifford's." The Defendant stated that he thought the victim was reaching for a gun but that the victim hit him in the head instead. When the victim attempted to strike him again, he jumped up; however, the victim grabbed him "by the hair of the head." The Defendant hit the victim "in the back of the head" in an effort to get the victim on the floor, away from the chair, where he believed the victim was hiding a gun. The Defendant could not remember how many times he had hit the victim, but he knew that he did not hit the victim "smack in the face." At some point, he and the victim fell to floor. The Defendant did not know if he hit the victim while he was on the floor. While on the floor, the victim said, "[N]o, Sammy." When the victim said the Defendant's name, the Defendant "stopped and r[a]n out the door . . . as hard as [he] could go." The Defendant said that he ran because he was afraid the victim would shoot him. The Defendant went to the Natchez Trace Parkway and hid in the woods until the next day. The Defendant admitted that he never saw the victim with a gun that night.

The Defendant stated that the recliner was not tipped over when he left and that he did not see any blood when he left. The Defendant stated that he was not trying to kill the victim but that he fought the victim because he was trying to prevent the victim from "getting to a gun or a weapon of any kind." On Monday, the Defendant learned that the victim had died. The Defendant stated that the victim was alive when he left and that when he left, he saw "four or five or six Mexicans" talking in the victim's yard. The Defendant explained that he believed that the "Mexicans" had probably entered the victim's house and killed the victim. The Defendant further explained that the victim had "already been into it with the Mexican kids out there."

Relative to his fear of the victim's possession of a weapon, the Defendant testified that he was aware of an earlier incident between the victim and Jesse Patterson. The Defendant related that in 2005 or 2006, Mr. Patterson told the Defendant that the victim had hit him in the head with a hammer. When the Defendant asked the victim about hitting Mr. Patterson in the head with a hammer, the victim admitted that he had hit Mr. Patterson and stated that he would likely have to go to jail. The Defendant testified that he was also aware of another incident between the victim and Steven Green. The victim told the Defendant that he had argued with Mr. Green and shot at him in 2004 or 2005. The victim also told the Defendant that he had "pulled a gun" on Mr. Green a second time to prevent Mr. Green from "jumping" on him. The Defendant explained that Mr. Green and the victim continually argued over Mr. Green's wife. The Defendant testified that the victim had also threatened him in 2004 or 2005 with the same weapon when the Defendant "broke wind" in the victim's house. The victim did not aim the gun at him, but the victim held the gun and told the Defendant to get out of the house.

## ANALYSIS

The Defendant contends that the trial court erred in refusing to admit testimony from two witnesses, Steven Green and Jesse Patterson, who would have testified concerning the victim's prior violent acts against them. The Defendant asserts that this testimony was relevant and admissible to support his contention that the victim was the first aggressor and that he acted in self-defense. The State responds that the trial court properly excluded the evidence because the probative value of the testimony was substantially outweighed by the danger of unfair prejudice when the prior violent acts were not similar in nature to the events that occurred on the night of the victim's death. The State alternatively responds that any error in refusing to admit the evidence was harmless when the Defendant was allowed to testify about his knowledge of the prior violent acts and when the evidence of the Defendant's guilt was overwhelming.

The trial court held a jury-out hearing at which the witnesses testified. Mr. Green stated that approximately five years ago, his wife and the victim were at a bar when his wife called him and asked him to pick her up. When Mr. Green arrived at the bar, the victim "pulled a gun" on him and made him "back out the door into the parking lot." The victim fired the gun two times. On another occasion approximately four or five years ago, Mr. Green was outside of his residence starting his truck at 3 a.m. when the victim, who had been drinking, came "out to the trash can with his pistol." The victim threatened to kill Mr. Green; however, the victim did not discharge the weapon on that occasion. Mr. Green stated that he lived in that residence for approximately two years and that the victim, who lived in a residence behind Mr. Green, was obnoxious in the same manner "just about every week." He stated that he had to call the sheriff several times to get the victim off his property or to

get his wife out of the victim's residence. Mr. Green stated that he did not know the Defendant. On cross-examination, Mr. Green stated that most of his problems with the victim related to his wife's relationship with the victim. Mr. Green believed that the victim sold drugs to his wife. He stated that he never told the Defendant about his problems with the victim.

Mr. Patterson testified that on Memorial Day in 2005, he was at the victim's house at approximately 9:30 a.m. and that when he left, he told the victim he would return in the afternoon. When Mr. Patterson returned, the victim told him to "leave MF." Mr. Patterson responded by saying that he "would MF." As Mr. Patterson was walking away, the victim threw a claw hammer at him, striking him in the head and back. Mr. Patterson stated that the victim had been drinking that morning. On cross-examination, Mr. Patterson stated that he never told the Defendant what happened.

At the conclusion of the witnesses' testimony, defense counsel argued that while the Defendant could testify that he was aware of these incidents, the witnesses should also be able to testify. Defense counsel argued that their testimony should be admitted to corroborate the Defendant's assertion that the victim was the first aggressor. Defense counsel further argued that it was "vital to the defense to be able to corroborate these incidences actually did happen" to assure the jury that the Defendant was not "fabricating" the events in support of his defense. The State responded that while the Defendant could testify as to his knowledge of these prior violent acts, the witnesses themselves could not testify. The State asserted that their testimony would only be admissible if the State attempted to impeach the Defendant regarding his knowledge of the prior acts of violence. The State further asserted that even if the evidence were relevant, the evidence was subject to Rule 403 of the Tennessee Rules of Evidence. The State contended that the probative value of the testimony was substantially outweighed by its unfair prejudice when the victim was not available to rebut the testimony. Defense counsel responded that the evidence was relevant because the Defendant's theory of the case was that the victim was the first aggressor and that given that theory, the Defendant was "entitled to be able to corroborate those specific incidences."

The trial court refused to admit the testimony from the witnesses and found that the evidence was not relevant. The trial court stated that the Defendant could testify as to his knowledge of the victim's prior acts of violence but that he could not present the testimony from Mr. Green or Mr. Patterson unless the State "opens the door on it."

Following our review, we conclude that the trial court's ruling was erroneous. The Defendant sought admission of the evidence to corroborate his claim that the victim was the first aggressor and to further establish his reasonable fear of the victim. The trial court's ruling was predicated solely on the case law supporting admission of evidence to establish

the Defendant's fear of the victim. However, "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 780 (Tenn. Crim. App. 1995).

In those cases in which a defendant's fear of the victim is relevant, the defendant must be aware of the prior violent acts before testimony concerning the acts will be admitted from the defendant. Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978); see also State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994). If the defendant is aware of the prior violent acts, he may testify about what he observed or had been told about the prior acts. Id. If the State questions his basis of knowledge concerning the prior violent acts, then the defendant may introduce the corroborating witnesses in rebuttal. Id. These witnesses may only testify as to what they told the defendant, not as to what they personally observed. Id.

In those cases in which it is alleged that the victim was the first aggressor, the defendant may offer evidence through the testimony of a third person to support this assertion. Ruane, 912 S.W.2d at 781-82; see also Neil P. Coen, et al., Tennessee Law of Evidence § 4.04[5][d] (5th ed. 2005) ("[I]n a criminal case where there is some evidence suggesting that the victim was the first aggressor, the defendant may offer proof of the victim's prior violent acts with third persons."). This evidence is considered corroborative evidence, not substantive. Ruane, 912 S.W.2d at 781-82. Additionally, the defendant need not be aware of these prior violent acts. Hill, 885 S.W.2d at 357; see also State v. Furlough, 797 S.W.2d 631, 649 ("[W]hether the defendant knew of that reputation is irrelevant."). However, the evidence is "at minimum, subject to the balancing test set forth in Tennessee Rule of Evidence 403." State v. Marquette Houston, No. W2006-00095-CCA-R3-CD, 2007 WL 1890650, at *8 (Tenn. Crim. App. June 29, 2007), perm. app. denied (Tenn. Nov. 19, 2007).

Although relevant and admissible, evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. When issues of evidence relevancy are presented, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of its discretion may not be reversed on appeal unless the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

The excluded testimony was relevant and admissible to corroborate the Defendant's assertion that the victim, who had a habit of initiating confrontations, was the first aggressor. Additionally, the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice when the Defendant, whose credibility was at issue, was already permitted to testify as to the prior violent acts in support of his similar assertion that he was fearful of the victim. Accordingly, we conclude that the trial court erred in excluding the evidence. However, we further conclude that the error was harmless when the jury heard evidence from the Defendant concerning his knowledge of the victim's prior acts of violence and when the Defendant could not have prevailed with his theory of self-defense.

Although self-defense was adequately raised by the proof, the testimony introduced at trial reflected that the victim in this case was feeble, at best. While the victim was likely the first aggressor, the Defendant admitted that the victim did not have a weapon. Thus, the Defendant did not have a "reasonable belief that there [wa]s an imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-11-611(a). Additionally, the Defendant's excessive use of force was not "immediately necessary to protect" himself from the feeble victim's "attempted use of unlawful force." Tenn. Code Ann. § 39-11-611(a). Indeed, the Defendant was not injured as a result of the altercation. Accordingly, we conclude that the error in excluding the evidence was harmless because the exclusion of the evidence did not more probably than not affect the verdict. Tenn. R. App. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-10-